COMMONWEALTH of Pennsylvania, Appellee

v.

Jamey C. ROBERTSON, Appellant.

Superior Court of Pennsylvania.

Submitted Jan. 11, 2005.

Filed April 26, 2005.

Anser Ahmad, Harrisburg, for appellant.

Jennifer W. Gettle, Assistant District Attorney, Lebanon, for the Com., appellee.

Before: BENDER, GANTMAN and JOHNSON, JJ.

BENDER, J.:

¶ 1 Jamey C. Robertson ("Appellant") appeals from the September 17, 2003 judgment of sentence aggregating thirty to sixty years' incarceration following his convictions of possession of an instrument of crime, robbery, aggravated assault, reckless endangerment, and criminal attempt to commit homicide. The charges stem from a brutal attack and robbery of Giov-anni Amato ("Amato") at his pizza shop on October 17, 1999.

¶ 2 Appellant filed the present appeal and now raises three issues on direct appeal:

> Whether the trial court erred in denying the Appellant's Post–Trial Motion that the evidence presented at trial was insufficient to establish every element of possession of an instrument of crime, robbery, aggravated assault, reckless endangerment, and criminal attempt to commit homicide beyond a reasonable doubt.

> Whether the trial court erred in denying Appellant's Post–Trial Motion that Elizabeth Robertson should have been permitted to testify at trial.

> Whether the trial court erred in denying Appellant's Post–Trial Motion that the sentence imposed was excessive.

Appellant's Brief at 4.

We affirm.

██ ¶ 3 Initially, Appellant makes a general challenge to the sufficiency of the evidence linking him to the crime. In other words, while Appellant does not contest that the attack occurred, Appellant does assert that the evidence did not establish that he was the perpetrator of the crimes in question. The standard of review for a sufficiency of the evidence claim is well settled:

> In evaluating a challenge to the sufficiency of the evidence, the test is whether, viewing all evidence admitted at trial, together with all reasonable inferences drawn therefrom, in a light most favorable to the Commonwealth as verdict winner, the trier of fact could have found that the defendant's guilt was established beyond a reasonable doubt.

*Commonwealth v. Capo,* 727 A.2d 1126, 1127 (Pa.Super.1999).

¶ 4 As a starting point, we first evaluate the evidence presented by the Commonwealth at trial. The Commonwealth presented testimony of Amato describing the attack upon his person. Mr. Amato testified that on the night of October 17, 1999, he was working at his pizza shop. N.T. Trial, 8/6–7/03, at 23. At approximately 8:30 p.m., he was standing at the front counter of the shop near the register when, without warning, he was stabbed in the face from behind. *Id.* at 25. As he attempted to turn around, Mr. Amato was stabbed for the second time in the stomach. *Id.* After the second knife stab, the assailant demanded money. *Id.* at 25. Mr. Amato tried to open the register, but had difficulty doing so. The assailant then attempted to slash Amato again. Because Mr. Amato drew back from the slashing knife, he sustained only a superficial cut on his neck. *Id.* at 26, 32. Mr. Amato then was able to open the register and the assailant grabbed several twenty-dollar bills from inside the register and fled. *Id.* at 26. Mr. Amato could not provide a detailed description of the person who attacked and robbed him. All that Mr. Amato could provide was that the assailant was male, around six feet tall, dark skinned, and wore a mask and dark jacket. *Id.* at 33–34, 38.

¶ 5 Lebanon City Police Detectives Daniel Wright and Christopher Rutter also testified on behalf of the Commonwealth. Detective Wright testified that on October 20, 1999, he was notified that anonymous phone calls relating to the case were received at Amato's pizza shop and the police station. *Id.* at 107. The calls were traced to a payphone at Linda's Corner Store. Upon visiting that location, Detective Wright found Shanita Allen and Lori Zechman on the phone with police. *Id.* at 107–108. Zechman mentioned Appellant's name in connection with the robbery and that he lived in a local apartment, known as 1001 Spruce Park. *Id.* at 109. Detective Wright later ran a driver's license check and verified that Appellant lived at 1001 Spruce Park and was approximately six feet, one inches in height. *Id.* at 110. Detective Rutter testified that on October 29, a search warrant was obtained for 1001 Spruce Park. *Id.* at 124. During the search, several jackets were taken into custody, including a New York Giants football jacket. *Id.*

¶ 6 Police Officer Bord, on behalf of the Commonwealth, testified that preliminary tests on the Giants jacket indicated that it was stained with blood. *Id.* at 146–149. The Commonwealth also called Pamela Call, a forensic scientist with the Pennsylvania State Police's DNA Laboratory. *Id.* at 166. Call testified that blood samples from the victim, Amato, matched the DNA from blood stains on the Giants jacket. *Id.* at 178.

¶ 7 Finally, the Commonwealth presented testimony from Michael Allen at trial. Allen testified that on the night in question, Appellant had been at Allen's home, approximately two blocks from Amato's pizza shop, along with Allen's two brothers and another friend. The group was drinking alcohol and smoking marijuana in the basement. *Id.* at 62, 97. At some point, Allen's brothers and the friend left the residence for various reasons, and only Allen and Appellant remained. *Id.* at 66. Appellant said, "Look, I will be back." Allen was not sure of the exact time Appellant left, but believed it was around 7:00 or 8:00 p.m. *Id.* at 68. Allen testified that Appellant was gone for possibly as long as an hour. *Id.* at 66–67. Appellant returned with money rolled up in a jacket. *Id.* at 69. When questioned about where the money came from, Appellant repeatedly said, "Don't worry about it." *Id.*

¶ 8 Allen testified that it was odd for Appellant to have that much money. *Id.* at 72. Allen also identified the jacket that he had seen Appellant carrying the night of the robbery as the same Giants jacket that had been found at Appellant's home with bloodstains on it. *Id.* at 73–74. About two days later, after Allen was questioned by the police, he went to speak with Appellant outside of 1001 Spruce Park. *Id.* at 75. Appellant again told Allen not to worry about it, but he also told Allen not to say anything about that night. *Id.* at 76. Allen told Appellant that the police were looking for him and to get out of town. *Id.* 76–77. That was the last time Allen saw Appellant. *Id.* at 77–78.

¶ 9 Appellant's attack upon the sufficiency of the evidence linking him to the assault/robbery is multifaceted. Appellant first asserts that the evidence was wholly circumstantial. Appellant secondly points out that there was no positive identification of him as the assailant. Appellant also claims that Allen's testimony, which he alleges is the key evidence the Commonwealth relied on to link Appellant to the crimes, was inconsistent and, as such, entirely unreliable.

■ ¶ 10 Initially, we must emphasize that the Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence. *Commonwealth v. Lehman,* 820 A.2d 766, 772 (Pa.Super.2003). Furthermore, even if the Commonwealth presented only circumstantial evidence and offered no positive identification of the assailant, we may not weigh the evidence and substitute our judgment for the fact-finder as long as the evidence was sufficient to prove Appellant's guilt. *Id.*

¶ 11 Although the bulk of the evidence connecting Appellant to the crime was circumstantial, and although the testimonial evidence involves some contradiction, we conclude that the evidence was sufficient to link Appellant to the crime. The evidence, viewed in the Commonwealth's favor, reveals that a jacket found in Appellant's residence with the victim's blood was worn on the night of the robbery. Appellant was placed near the scene of the crime at the approximate time of the attack, leaving Allen's residence for a period of time and returned with a sum of money for which he had no explanation. Appellant also told Allen not to worry about where the money came from and not to talk about it with anyone else. The whole of the evidence unquestionably links Appellant to the commission of the crime.

■ ¶ 12 Specifically addressing the unreliability of Allen's testimony, Appellant builds an argument predicated upon the fact that when first questioned about Appellant's involvement in the attack/robbery, Allen disavowed any knowledge that Appellant was involved. Although it is true that Allen first disclaimed knowledge of the robbery when initially questioned, the credibility of the witness' testimony and weight assessed thereto is a question for the trier of fact, unless so inconsistent as to allow no finding beyond a reasonable doubt. *Id.* At trial, Allen provided the following explanation for his prior prevarication:

> MRS. GETTLE (ADA): And why were you trying to lie to get out of being here?
>
> MR. ALLEN: Cause he was my friend. I felt that he was my friend, I was doing the right thing by lying to keep him from going to jail, you know, do you know what I mean. I was caught in the middle. He was at my house with money, so I didn't know what to do, do you know what I am saying.

N.T. Trial, at 101.

¶ 13 After reviewing Allen's testimony and this explanation for his prior inconsis-

tent statements, we cannot find as a matter of law that Allen's testimony was so inconsistent as to allow no finding beyond a reasonable doubt. Of course, if allowed to stand, Allen's testimony when considered in conjunction with the other circumstantial evidence quite adequately established that Appellant was the perpetrator of the crime in question.

¶ 14 Appellant secondly argues that the evidence was insufficient to support his conviction of criminal attempt to commit homicide. For the Commonwealth to prevail in a conviction of criminal attempt to commit homicide, it must prove beyond a reasonable doubt that the accused with a specific intent to kill took a substantial step towards that goal. *Commonwealth v. Hobson*, 413 Pa.Super. 29, 604 A.2d 717, 719–720 (1992). We have held that a specific intent to kill can be inferred from the circumstances surrounding an unlawful killing. *Commonwealth v. Geathers*, 847 A.2d 730, 737 (Pa.Super.2004). Moreover, specific intent to kill may be inferred from the fact that the accused used a deadly weapon to inflict injury to a *vital* part of the victim's body. *Id.*

¶ 15 Appellant argues specifically that the Commonwealth did not present any medical testimony proving that the areas of the victim's body that were stabbed were vital. Consequently, Appellant contends, the jury was presented with insufficient evidence to convict Appellant of this charge. We find Appellant's argument that expert testimony was required

to prove that the injuries were to vital areas unconvincing.[1] The purpose of expert testimony is to assist the fact-finder in grasping complex issues not within the knowledge, intelligence, and experience of the ordinary layman. *Commonwealth v. Begley*, 566 Pa. 239, 780 A.2d 605 (2001). We cannot agree that determining what areas of the body are vital is a complex issue that would require medical testimony. We believe that an ordinary layman could conclude without expert testimony that Amato's head, stomach, and neck are vital areas. Beyond this, the parties stipulated that injuries to these areas placed Amato at immediate risk of death, further evidencing these areas were vital to Amato's survival. N.T. Trial, at 55. Based on the evidence presented at trial and without further expert testimony, we find that the jury could infer that the areas injured were vital.

¶ 16 In light of the above, we conclude that the evidence was sufficient to prove beyond a reasonable doubt that Appellant with a specific intent to kill took a substantial step towards that goal. The evidence, viewed in the Commonwealth's favor, reveals that Appellant used a deadly weapon, a knife, to inflict injuries to vital areas of a victim's body, Amato's head, stomach, and neck. *Id.* at 25–26. This is sufficient to prove specific intent to kill. This inference is further supported by the fact that the attack went far beyond what would have been necessary to accomplish the robbery. Furthermore, evidence of the infliction of the injuries to Amato is sufficient to prove

1. Although we address the Appellant's contention that the Commonwealth cannot prove the areas injured were vital without further expert testimony, we note that this is not an essential element for a conviction of criminal attempt to commit homicide. Proving that the Appellant used a deadly weapon to inflict injury to the victim's vital areas is just one way to prove specific intent to kill. Specific

intent to kill could also be inferred from other surrounding circumstances of the unlawful attack. For example, the evidence viewed in the Commonwealth's favor shows that the Appellant crept from behind and stabbed an unknowing, defenseless victim before demanding money. We conclude that this evidence is also sufficient to prove that the Appellant acted with a specific intent to kill.

that a substantial step toward the goal of killing the victim occurred.

¶ 17 Appellant also argues that that evidence was insufficient to support his conviction of possessing instruments of crime. Possessing Instruments of Crime is defined as follows:

§ 907. **Possessing instruments of crime**

(a) CRIMINAL INSTRUMENTS GENERALLY.—A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally.

18 Pa.C.S. § 907(a). Accordingly, the Commonwealth must prove beyond a reasonable doubt that the defendant (1) possessed any instrument of crime and (2) with intent to employ it criminally.

¶ 18 Appellant does not challenge the sufficiency of the evidence to prove the intent requirement of the statute. Rather, he claims that the evidence was not sufficient to prove the first element of the statute, that he possessed an instrument of the crime. Specifically, referencing the statutory definition of the term "instrument of crime," Appellant asserts that the Commonwealth must prove that the knife used in the attack was an instrument *commonly* used for criminal purposes. Appellant contends that because the Commonwealth failed to present evidence that the knife was an instrument commonly used for criminal purposes, the conviction on this count is unsupportable. We disagree.

¶ 19 Appellant's assertion that the Commonwealth must prove that the knife was commonly used for criminal purposes arises from a discrepancy over the definition of "instrument of the crime." To put Appellant's argument into proper context, we acknowledge that prior to 1995 the statutory definition of instrument of crime was as follows:

(2) anything *commonly* used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have.

Act of December 6, 1972, P.L. 1482, No. 334, § 1 *(emphasis added)*. However, in 1995, the definition of instrument of crime was modified, apparently in response to the Pennsylvania Supreme Court's decision in *Commonwealth v. Ngow*, 539 Pa. 294, 652 A.2d 305 (1995), by deleting "commonly" from the definition of instrument of the crime. Consequently, the amended definition read:

(2) anything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have.

Act of July 6, 1995, P.L. 238, No. 27, § 1. On paper, the above amendment was short-lived, as the following year the legislature again amended section 907 and appeared to insert "commonly" back into the definition of an instrument of crime in 1996. The post–1996 amendment left the definition as follows:

"Anything *commonly* used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have."

(emphasis added) Act of July 11, 1996, P.L. 552, No. 98, § 1. However, despite the re-insertion of the term "commonly" into the definition of instrument of crime, a panel of this Court concluded that this re-insertion was an oversight of the legislature and not an intended amendment to the definition. Relying upon provisions of the Statutory Construction Act, this Court, in *Commonwealth v. Magliocco*, 806 A.2d 1280, 1284 (Pa.Super.2002), *appeal granted*, 573 Pa. 689, 825 A.2d 638 (2003), concluded that the word "commonly," as it appears in the text of the 1996 amendment, was not an expression of the legislative will and is a legal nullity. *Id.* at 1285.

Thus, according to *Magliocco*, the controlling definition of "instrument of crime" remains:

> Anything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have.

*Id.* As such, Appellant's argument that the Commonwealth must prove a knife is an instrument commonly used in crime is contrary to the express holding in *Magliocco*, and, therefore, is foreclosed.

¶ 20 Having clarified the statement of the law on this issue, we now conclude that the evidence was sufficient to prove the defendant possessed an instrument of crime with the intent to employ it criminally. Viewing the evidence in the light most favorable to the Commonwealth, Appellant utilized a knife to perpetrate a robbery and a vicious attack on Amato. A knife clearly fulfills the above enumerated definition of an instrument of crime. Furthermore, using the knife to perpetrate the robbery and a vicious attack proves intent to employ the instrument criminally.

¶ 21 Having addressed Appellant's sufficiency of the evidence claims, we move to his allegation that the trial court improperly precluded the testimony of Appellant's mother, Elizabeth Robertson. Prior to the commencement of trial, both parties agreed to a sequestration of witnesses. N.T. Trial, at 5. Appellant attempted to call Ms. Robertson, who had been in the courtroom listening to the testimony throughout the trial. *Id.* at 185. Appellant proposed that Ms. Robertson would testify that Appellant was separated from his wife at the time police found the New York Giants jacket at 1001 Spruce Park. Apparently, after introduction of this evidence, Appellant intended to argue that as he was not residing at 1001 Spruce Park during the time in question his ownership of the Giant's jacket was called into ques-

tion. Upon objection, the trial court precluded the witness' testimony. *Id.* at 186.

¶ 22 Our standard of review for exclusion of testimony is as follows:

> It is well established in this Commonwealth that the decision to admit or to exclude evidence lies within the sound discretion of the trial court. Moreover, "our standard of review is very narrow; we may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party."

*Ettinger v. Triangle–Pacific Corp.*, 799 A.2d 95, 110 (Pa.Super.2002) (citations omitted).

¶ 23 The Commonwealth contends the trial court appropriately precluded the testimony because the witness violated a sequestration order and the testimony proposed would have been inadmissible hearsay. The trial transcript reveals that the lower court also excluded Ms. Robertson's testimony on the basis that it was not the "best evidence" of Appellant's separation from his wife.

¶ 24 We first address preclusion of the testimony based on violation of a sequestration order. The selection of a remedy for the violation of a sequestration order is within the discretion of the trial court. *Commonwealth v. Smith*, 464 Pa. 314, 346 A.2d 757 (1975). However, to deny a criminal defendant the opportunity to present relevant and competent evidence in his defense would constitute a violation of his fundamental constitutional rights to compulsory process for obtaining witnesses in his favor and to a fair trial. *Commonwealth v. Scott*, 496 Pa. 78, 436 A.2d 161, 163 (1981) (citing U.S. Const. amend. VI and XIV; Pa. Const. art. 1, § 9;

*Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). More than a century ago, the United States Supreme Court held that a defense witness' violation of a sequestration order alone did not warrant exclusion of his testimony. *Holder v. United States,* 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893). Absent a showing of fault on the part of the party or counsel who called a witness, an exclusion of a criminal defendant's witness' testimony solely because the witness violated a sequestration order is an abuse of discretion. *Scott,* 436 A.2d at 163.

¶ 25 At trial, Appellant's counsel stated that the violation of the sequestration order was inadvertent:

> MR. ARNOLD: One, I did not know she was coming. Two, I didn't know she was here. Three, I did not know who she was. Four, I didn't know she would be testifying until the trial played out.

N.T. Trial, at 186.

The Commonwealth did not dispute this offering. As such, we have no basis for finding bad faith or fault on Appellant's part in the violation of the sequestration order. Accepting that there was no showing of fault on the part of Appellant, if the exclusion of the witness' testimony was based only on the violation of sequestration order, we would be inclined to find an abuse of discretion. Bolstering this position is the fact that, at trial, the Commonwealth appeared to agree with Appellant that the testimony should not be excluded based only on the violation of the sequestration order.[2] *Id.* at 187. As such, we cannot agree with the trial court to the extent the decision to exclude the testimony was based upon a violation of the sequestration order.

¶ 26 Nevertheless, the Commonwealth's primary objection to admission of the testimony was that Ms. Robertson's testimony was inadmissible hearsay. Apparently, it was the Commonwealth's position that the only way Mrs. Robertson would know of the separation would be due to statements from either Appellant or his wife.

¶ 27 Hearsay is defined as follows:

> "Hearsay" is a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Pa R.E. 801(c). The hearsay rule in Pennsylvania is established by statute:

> Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court or by statute.

Pa R.E. 802. If Ms. Robertson's testimony was based on statements made by the Appellant or Appellant's wife to prove the couple was separated, the testimony would indeed be hearsay. As such, the testimony would be properly excludable unless it was covered by one of the hearsay exceptions, none of which has been proffered by Appellant as applicable here.

¶ 28 Appellant now alleges that Ms. Robertson would have testified only to her own first hand knowledge of her son's residence in her home during the relevant period. One could then surmise from the fact that Appellant was residing full time with his mother that he was not residing at 1001 Spruce Park. While this contention surely changes the nature of the inquiry, we note that Appellant's counsel never suggested, during the offer of proof, that Mrs. Robertson's testimony would be

---

**2.** Appellant's counsel correctly argued that the nature of the proffered testimony would not have been aided or affected by listening to the testimony of the prior witnesses.

based upon personal observation. Counsel's proffer follows:

> Mr. ARNOLD: And Elizabeth Robertson, Mr. Robertson's Mother, I would like to just basically—one, it is her son, *she lives in New Jersey,* and has throughout this whole time, and that he was separated from his wife back in September of 1999.

N.T. Trial, at 185 (emphasis added). Appellant's counsel did not indicate that Ms. Robertson was physically living with Appellant, he offered only that *she lived in New Jersey.* After reviewing the record, there are no other facts that would indicate Ms. Robertson's testimony was based on anything other than conversations with Appellant or his wife. As such, based upon the information before the court, the court's decision to exclude Ms. Robertson's testimony was not in error.

¶ 29 The final issue Appellant presents is whether the sentence imposed by the sentencing court was excessive. Following his conviction, Appellant was sentenced to an aggregate thirty to sixty years' incarceration. This sentence is a deviation above and beyond the statutory sentencing guidelines found at 204 Pa.Code §§ 303.1—303.18.[3] Appellant's appeal, based on the excessiveness of the sentence, challenges the discretionary aspects of the sentence.

¶ 30 Initially, we note that an appellant who challenges the discretionary aspects of his sentence does not have an appeal as of right but, rather, must seek and be granted allowance of appeal. *Commonwealth v. Schaffer,* 2005 Pa Super 14, 22 (filed January, 12, 2005). Our Rules of Appellate Procedure require an appellant to set forth in his brief to this Court a concise statement of reasons relied upon in support of granting allowance of appeal with respect to the discretionary aspects of the sentence. *Id.* (citing Pa.R.A.P. 2119(f)). The concise statement "must show that there is a substantial question that the sentence imposed was not appropriate under the Sentencing Code" in order for us to grant allowance of appeal on the discretionary sentencing issues. *Id.* (citing 42 Pa.C.S. § 9781(b)). A substantial question exists where the statement sets forth a plausible argument that the sentence violates a particular provision of the Sentencing Code or is contrary to the fundamental norms underlying the sentencing scheme. *Id.*

¶ 31 Here, Appellant's brief does not contain a Rule 2119(f) statement. The Commonwealth, however, has not objected to this omission. When the appellant has not included a Rule 2119(f) statement and the appellee has not objected, this Court may ignore the omission and determine if there is a substantial question that the sentence imposed was not appropriate. *Commonwealth v. Kiesel,* 854 A.2d 530, 533 (Pa.Super.2004). Although this Court is permitted to overlook a party's failure to provide a 2119(f) statement, it should only do so in situations where the substantial question presented is evident from the appellant's brief. *Commonwealth v. Saranchak,* 544 Pa. 158, 675 A.2d 268, 277 n. 18 (1996).

¶ 32 Briefly reviewing Appellant's Summary of the Argument, he states that the trial court erred in deviating beyond the

---

**3.** Due in large part to Appellant's prior record score, the standard range of the guidelines called for a sentence of 168–240 months for attempted homicide. Appellant received 20 years, or 240 months. As such, this sentence falls at the high end of the standard range. However, the standard range for robbery was 72–90 months, and the aggravated range was up to 102 months. Appellant received 120 to 240 months' imprisonment, or 18 months beyond the aggravated range.

guidelines based on the seriousness of the offense and Appellant's prior record. He claims these considerations are included in the guidelines and deviation beyond the guidelines based on these factors is an abuse of discretion. Appellant essentially contends that the reasons offered by the sentencing court did not justify a deviation beyond the guidelines. We also note that the sentencing court imposed the maximum sentence on the attempted murder charge. This Court has found a substantial question exists where the sentencing court failed to provide sufficient reasons for imposing a sentence outside of the guidelines. *Commonwealth v. Monahan*, 860 A.2d 180, 182 (Pa.Super.2004). Given all of the above, we conclude that a substantial question is evident from Appellant's brief.

■■■■ ¶ 33 When reviewing the discretionary aspects of a sentencing our standard of review is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, bias or ill-will.

*Commonwealth v. Reyes* 853 A.2d 1052, 1055 (Pa.Super.2004). However, as noted in *Commonwealth v. Walls*, 846 A.2d 152, 157 (Pa.Super.2004):

> [the] deference paid to the trial court does not necessitate a rubber stamped approval of the sentences imposed by the sentencing court. Appellate review of sentencing matters would become a mockery and a sham if all sentences were routinely affirmed under the guise of discretion of the trial court. Further,

it must be considered our function to review sentences in a more detached manner so that we can ensure not only a fair and impartial sentence under the circumstances, but also to protect against grossly disparate treatment of like offenders throughout the Commonwealth

*Id.* (quoting *Commonwealth v. Smart*, 387 Pa.Super. 518, 564 A.2d 512, 514 (1989)).

■■■■ ¶ 34 As mentioned above, Appellant contends that the reasons offered by the sentencing court were not sufficient to justify a deviation beyond the sentencing guidelines. When fashioning a sentence, in addition to considering the gravity of the offense in relation to the impact on the victim and the community, the protection of the public, and the defendant's need for rehabilitation, the sentencing court must also consider the sentencing guidelines. *Schaffer*, at 25 (citing 42 Pa. C.S. § 9721). Although the sentencing guidelines are considered advisory, the sentencing court is still charged with considering them and determining whether to apply them or whether circumstances of the individual case require departure from them. *Id.*

¶ 35 When a sentencing court decides to deviate from the guidelines, as was the case here, it must provide a contemporaneous written statement of the reason or reasons for the deviation from the guidelines. *Id.* (citing 42 Pa.C.S. § 9721(b)). The sentencing court provided the following in regard to its deviation from the sentencing guidelines:

> Jamey C. Robertson, your age at the time, 29, your serious previous record, and the depravity of the crimes against a defenseless human being, calls out for the maximum punishment the legislature allows. Moreover, I intend to deviate beyond and above guidelines, due to

the seriousness of this offense, and your prior record of serious felonies.

N.T. Sentencing, 9/17/03, at 17.

¶ 36 Recently, this Court has applied increasing scrutiny to sentences based on the "seriousness of the offense." We have recognized that the guidelines provide the predesignated ranges of punishment for the offense considering the inherent egregiousness of the conduct which is generally associated with the commission of that offense. *Walls,* 846 A.2d. at 158. Thus, the inherent seriousness of the offense is taken into consideration in the guideline recommendations. *Id.* If the sentencing court imposes a sentence that deviates significantly from the guideline recommendations, it must demonstrate that the case under consideration is compellingly different from the "typical" case of the same offense or point to other sentencing factors that are germane to the case before the court. *Id.* These factors include the character of the defendant or the defendant's criminal history. *Id.*

¶ 37 In its opinion regarding the Appellant's Post–Sentence Motions, the sentencing court more thoroughly explains its reliance on the seriousness of the offense.

The Defendant's argument also completely ignores the viciousness of the attack on this victim. The Defendant argues that the offenses severity is taken into account in calculating the Guidelines. We disagree. The Defendant's guidelines were based on the infliction of serious injury upon the victim. What the Defendant has chosen to ignore is the fact that there were three potentially life-threatening injuries upon Mr. Amato

As stated at the sentencing, this was not a case where a robber faced a non-compliant victim and caused injury attempting to merely effectuate the crime. Rather, this Defendant went to the victim's business, knifing Mr. Amato, without ever giving him a chance to comply with demands. Then, after the severely injured victim handed over the money, the Defendant attempted to slash the victim's throat.

Trial Court's Opinion, 2/28/04, at 20.

¶ 38 With regard to the above commentary, we find the trial court's analysis flawed. While the trial court's points would have merit had Appellant been convicted of aggravated assault, we find them inapposite with respect to the crime of attempted murder. Although the crime of aggravated assault has been described as an attempted murder that falls short of the intended consequence,[4] the fact remains that aggravated assault requires only the infliction or attempted infliction of serious bodily injury. In this context, the brutality of the attack would be a factor that can adequately and meaningfully distinguish among numerous possible hypothetical occurrences of aggravated assaults. Indeed, an aggravated assault would have been completed with the initial stabbing of Mr. Amato thus, it would be a legitimate point to consider the "extra" attacks upon Mr. Amato in distinguishing the present attack from a "standard" aggravated assault.

¶ 39 In contrast, as the name implies, an attempted murder requires the factfinder to conclude that the actor acted with the intent to take human life. While history demonstrates that there are numerous ways in which one may take another's life, one must ask whether the choice in the manner of attempting to kill another

4. "Aggravated assault is, indeed, the functional equivalent of a murder in which, for some reason, death fails to occur." *Commonwealth v. O'Hanlon,* 539 Pa. 478, 653 A.2d 616, 618 (1995).

meaningfully distinguishes one attempted murder from another? Certainly, in most cases, the *mens rea* is essentially the same. Here, crediting the jury's verdict that Appellant sought to end Mr. Amato's life, all the stabbings were part and parcel of the attempt to take Mr. Amato's life. The first did not prove immediately fatal, requiring another attempt. While, quite fortunately, the attempt failed, does the fact that there were three individual wounds inflicted, none of them proving mortal, meaningfully distinguish the present attack from other attempts to take human life? From a *mens rea* perspective, we think not. Perhaps if an actor tortured an individual while attempting to take his life, an argument could be realistically posited that the crime was more "evil" than the typical attempt to take a human life. However, to be candid, the argument advanced by the trial court, and considered purely in an academic stance, is similar to that rejected in *Walls*.

¶ 40 Nevertheless, the sentencing court also points to another sentencing factor germane to the case that would not necessarily be considered by the Guideline's prior record score. The court states:

[this] Defendant's record showed a propensity for violent crimes very similar in their characteristics. In addition, the Defendant's prior record also revealed an escalating level of violence in terms of the commission of his repeated robberies.

*Id.* at 19.

¶ 41 The fact that Appellant has a substantial history of violent crimes of progressive or escalating violence does indicate a particularly grave threat to the safety of society in general. That is, it is fair to say that Appellant displays a profile that makes him a grave risk to seriously injure or kill another innocent individual. While recognition of this fact does require the court to, in effect, overemphasize one aspect of the purposes of imposing punishment (protection of the public vs. rehabilitation/retribution/general deterrence), we believe that the facts of this case do justify the departure from the guidelines, particularly here, where the departure is not that substantial. Although we believe that imposition of statutory maximum sentences are to be reserved for very extreme cases, and although possibly we might not have imposed a similar sentence if vested with the initial opportunity to impose sentence, the critical issue is whether the sentence arrived at constitutes an abuse of the discretion granted to the sentencing court. Here we cannot so conclude.

¶ 42 Judgment of sentence affirmed.

¶ 43 Judge GANTMAN concurs in the result.