J-S06039-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NIESHA DONTAY HUNTER | : | |
| | : | |
| Appellant | : | No. 566 WDA 2025 |

Appeal from the Judgment of Sentence Entered December 2, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0006262-2023

BEFORE: KUNSELMAN, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:         **FILED: March 11, 2026**

Appellant, Niesha Dontay Hunter, appeals from the judgment of sentence entered in the Court of Common Pleas of Allegheny County following her conviction at a bench trial on the charges of reckless burning or exploding, 18 Pa.C.S.A. § 3301(d)(2), and criminal mischief, 18 Pa.C.S.A. § 3304(a)(1). After our careful review, we affirm.

The relevant facts and procedural history are as follows: On October 3, 2023, the Commonwealth filed an Information charging Appellant with the offenses indicated *supra*. On July 15, 2024, Appellant, represented by counsel, proceeded to a bench trial.[1] At the commencement of trial, the

---

[*] Former Justice specially assigned to the Superior Court.

[1] The trial court colloqued Appellant as to her right to a jury trial and found Appellant voluntarily waived that right. N.T., 7/15/24, at 4-8.

parties stipulated to the introduction of various Commonwealth exhibits, including Ring Camera footage, police body camera footage, photographs taken at the scene, and a report from the Allegheny County Crime Laboratory. N.T., 7/15/24, at 9-10. Moreover, the parties stipulated to the introduction of Defense Exhibit A, which was a screenshot of Appellant and her friend entering a business establishment with a time stamp of 1:31 a.m. on April 16, 2023. *Id.* Upon questioning by the trial court, defense counsel indicated he would prove the screenshot was from the SAAP Club, which is located on the North Side of Pittsburgh. *Id.* at 11. The Commonwealth then called its first witness.

Shataya McCoy ("Ms. McCoy") testified she has known Appellant for approximately thirteen years, and at one point, Appellant stayed with her for a week in her house on Chester Avenue in Pittsburgh. *Id.* at 14. Ms. McCoy testified that Appellant's cousin is the father of Ms. McCoy's children. *Id.*

Ms. McCoy indicated that, during the late evening hours of April 15, 2023, to the early morning hours of April 16, 2023, she was at Art's Tavern ("the tavern") on Penn Avenue when Appellant arrived at the tavern. *Id.* at 15. She and Appellant had a verbal argument regarding the fact Appellant's cousin "had been locked up" earlier that day. *Id.* During the argument, Ms. McCoy pushed Appellant, and the tavern's staff told her to leave. *Id.* at 16.

Ms. McCoy testified she went outside, and Appellant followed her, trying to engage in a physical fight while the two women yelled at each other. *Id.*

She indicated that Appellant also tried to fight with Christine Higgins, who is Ms. McCoy's friend, and told her she would "get it." *Id.* Ms. McCoy could not remember precisely what time she arrived at the tavern or what time she left; however, she was at the tavern for approximately two hours. *Id.*

On cross-examination, Ms. McCoy clarified that Appellant was angry at her because her cousin, the father of Ms. McCoy's children, had been jailed. *Id.* at 18. During their argument, Appellant made derogatory comments about Ms. McCoy's children. *Id.* Ms. McCoy indicated that, after she left the tavern, she went to a friend's house. *Id.* While she was at her friend's house, she received a phone call from a neighbor, who reported a vehicle outside of Ms. McCoy's house was on fire, and it appeared to be Ms. McCoy's vehicle. *Id.* Ms. McCoy testified that her vehicle was a 2017 black Mitsubishi Outlander. *Id.* at 20.

The following relevant exchange occurred between Appellant's counsel and Ms. McCoy on cross-examination:

Q. And you went home after you got the call about the vehicle?
A. Yes, once I got the phone call, I looked at my camera, and I seen [*sic*] her on the screen, and I went home.
Q. You provided Ring footage to the police, correct?
A. Yes.
Q. Of her at your house---
A. Yes.
Q.—before the fire?
A. Yes.
Q. Okay. Did you see her on Ring footage after the fire?

A. Did I see her on Ring footage after the fire? Not my Ring footage.

Q. Did you see her on any Ring footage?

A. The neighbors had it. And it was like her, at the car.

Q. The neighbors had this footage—

A. Uh-huh.

Q. –of her at the car.

Before or after the car was on fire?

A. This was right before the car was on fire.

Q. Okay. And she was leaving the area?

A. Yes.

Q. Okay. Did you see this footage?

A. The footage, yes.

Q. Okay.

A. You could see someone running away.

Q. Okay. So, any of the footage that you had, you gave it to the police, correct?

A. I did.

*Id.* at 18-20.

Ms. McCoy clarified on redirect examination that, when she left her house to go to the tavern during the late evening hours of April 15, 2023, she did not drive but went with friends. *Id.* at 20. She further had a friend drive her from the tavern to another friend's house. *Id.* When she left for the evening, her car was parked "across the street from [her] house in front of a telephone pole." *Id.*

Gerald Stover ("Mr. Stover") testified that he has known Appellant for "a couple of years," and he recognizes her voice. *Id.* at 23. Mr. Stover

testified that Ms. McCoy is his mother, and he lives with her in her house. *Id.* at 26. On April 16, 2023, he was in his upstairs front bedroom when he "heard banging on the [front] door." *Id.* He went downstairs, and he heard someone saying "a monologue" outside the door. *Id.* at 25. He observed Appellant standing outside of the door, and by the time he opened the door, Appellant "was just walking away." *Id.* at 26. He did not see anyone with Appellant. *Id.* Mr. Stover was unsure of what time this occurred on April 16, 2023, but Ring Camera footage entered into evidence contained a time stamp of 12:33 a.m. *Id.* at 25.

Mr. Stover testified that, as Appellant walked away, he closed the door and went upstairs to his bedroom. *Id.* He then immediately heard "running; like feet slapping" outside. *Id.* He looked outside and didn't see anyone running, but he saw his next-door neighbor, Sheena Higgins, arriving home and going into her house. *Id.* at 27. Within a few minutes, he heard the noise of "something hitting something" coming from outside, so he looked out the window and saw the front of a car on fire. *Id.* at 28. He clarified that, from the time when he saw Appellant "just walking away" from the front door to the time he observed the fire, only five minutes had passed. *Id.* He, as well as his neighbor, Sheena Higgins, came out of their homes to see what was happening. *Id.*

Sheena Higgins ("Sheena") testified that she knew Appellant, and on April 16, 2023, she saw Appellant at the tavern. *Id.* at 33. She witnessed

Appellant and Ms. McCoy arguing at the tavern, and she tried to diffuse the situation. *Id.* After the altercation, Sheena and her sister, Christine Higgins ("Christine"), as well as Ms. McCoy, entered Christine's car while Appellant entered her own car. *Id.* Sheena drove Christine's car; she dropped Christine off at her home, and Ms. McCoy at a different bar. *Id.* Sheena then started driving towards her own home, but she briefly stopped at a gas station to talk to a friend. *Id.* She then went "straight home." *Id.* She confirmed her home is located next door to Ms. McCoy's home. *Id.* at 34.

She indicated that she arrived home at approximately 12:30 a.m. on April 16, 2023, and she parked Christine's car on the street near the front of her home. *Id.* at 35. She clarified she parked the car on the same side of the street as her home (and Ms. McCoy's home), and then she "went straight inside [her] house." *Id.* at 36. She did not see anyone outside at this point. *Id.* at 39.

Upon entering her home, Sheena went upstairs to check on her daughter, who informed her that she saw Appellant outside "screaming and hollering" just before Sheena came home. *Id.* at 37. Sheena then heard a "big boom." *Id.* Specifically, she clarified that, within less than five minutes of arriving home and going upstairs, she heard the "big boom." *Id.* She looked out the window and saw Christine's car, which she had been driving, on fire. *Id.* Sheena called 911 and went outside where Mr. Stover told her it "was Appellant." *Id.* at 38.

Christine testified she is familiar with Appellant, and she was at the tavern during the early morning hours of April 16, 2023, when Ms. McCoy and Appellant "got into a scuffle[.]" *Id.* at 41. After the women left the tavern and went outside, Ms. McCoy and Appellant began arguing again. *Id.* Appellant got "real close" to Ms. McCoy, and Christine tried "to break them up," at which point Appellant said to Christine, "I'll beat your ass too." *Id.* Christine testified Appellant wanted to "fight" her, but she "didn't pay much attention[.]" *Id.* at 42.

Christine confirmed that, after the altercation ended, she, Sheena, and Ms. McCoy entered Christine's car with Sheena driving. *Id.* Christine testified her car was a 2022 silver Mitsubishi Outlander. *Id.* at 43. She indicated that, shortly after Sheena dropped her off at her house, she received a telephone call indicating that her car was on fire. *Id.* at 44. She noted the value of the car was approximately $30,000.00, and she had only approximately $2,000.00 left to pay on her car loan. *Id.* Christine testified the insurance company "totaled" the car after the fire. *Id.* at 45. She noted that she needed to get a rental car, and she paid $10,000.00 in rental fees. *Id.*

Pittsburgh City Police Detective Michael Burns, who is assigned to the Fire Investigation Unit, testified the "call came into 911 at 1:37 a.m." *Id.* at 52. The first responding police officer, who was wearing a body camera, arrived at approximately 1:41 a.m., and the fire was still burning. *Id.* at 51. Detective Burns testified "[t]he fire department arrived on the scene within

three or four minutes, and then they began to extinguish the fire." *Id.* The responding police officer then requested the Fire Investigation Unit at 1:50 a.m., and Detective Burns arrived on the scene at 2:13 a.m. *Id.* at 49-50. Detective Burns viewed the police body camera footage and determined the "fire started small and then became large." *Id.* at 52. He opined the fire had been burning for seven to eight minutes. *Id.*

He testified he examined the car and determined the fire damage was to the exterior of the vehicle. *Id.* at 50. The fire did not originate in the interior compartment of the car. *Id.* He examined the car's engine and determined the fire did not originate in the engine compartment. *Id.* He testified the "fire patterns on the outside of the vehicle…showed some type of liquid was poured on the outside of the vehicle above the driver's side door that came down the windshield." *Id.* He also noticed that some liquid was poured over the front left fender and tire area of the vehicle, and the liquid was then set on fire. *Id.*

Detective Burns testified he was assisted by an "accelerant detection K9 Dodger," and the canine sniffed the fire scene. *Id.* at 53. K9 Dodger "alerted to the melted plastic fenders around the left front tire, where the left front fender burned off." *Id.* Detective Burns took a sample from the area to which K9 Dodger alerted, and he sent the sample to the Allegheny County Crime Laboratory, which determined gasoline had been used as an accelerant. *Id.* at 56. Detective Burns opined that the fire was intentionally set with the use

of an ignitable liquid, which was poured over the top of the roof of the vehicle. *Id.* at 62. The liquid traveled down the left side of the vehicle and over the left front fender onto the left tire; the liquid was then ignited with an open flame such as a lighter or match. *Id.* He indicated the evidence suggested someone brought the gasoline to the scene; that is, it was not siphoned out of a nearby vehicle. *Id.* at 63.

At the conclusion of the Commonwealth's case-in-chief, Appellant made an oral motion for judgment of acquittal, which the trial court denied. *Id.* at 64. Appellant did not testify, and she offered no witnesses.

During closing arguments, defense counsel argued that, according to the detective's testimony, the car fire was set at "approximately 1:29, 130 a.m." *Id.* at 71. Defense counsel further argued that "as you could see from Defense Exhibit A, Your Honor, [Appellant] was at the club on the North Side at 1:31 a.m., on April 16; she was not in the area. All of the witnesses agree that she was not seen in the area again after 12:33 a.m." *Id.* Defense counsel argued the name of the club was the SAAP Club, and it is located on Eckert Street in Pittsburgh. *Id.* at 73.

In response, the assistant district attorney ("ADA") argued that, although the Commonwealth did not dispute Defense Exhibit A depicts Appellant and shows a time stamp of 1:31 a.m., the Commonwealth disputed the location where the screenshot was taken. *Id.* That is, the ADA argued that Appellant presented no evidence as to where the screenshot was taken,

and the ADA urged the trial court to find incredible any assertion that the screenshot was from the SAAP Club. *Id.*

The trial court asked the ADA the address of where the car fire occurred, and the ADA indicated, "It [was] at [***] Chester Avenue, also on the North Side." *Id.* at 73. The ADA noted, "[F]rom a quick Google Maps search from the SAAP Club [to] [***] Chester [Avenue], it appears to be approximately 2.2 miles in distance." *Id.* at 74.

The trial court stated, "At 1:30 [a.m.], I can't imagine there's a lot of traffic on the North Side." *Id.* Defense counsel responded:

> Well, I think the problem with that is, Your Honor, the call came in around 1:37 a.m., and Detective Burns indicated that he believes the fire was only burning for approximately seven to eight minutes, which would make it about 1:29 a.m. to 1:30 a.m., when this fire started. Which, if we're giving her a time, it would be a minute.

*Id.* at 74-75.

The trial court stated, "There's no doubt that there was a fire. No doubt that it was arson. No doubt any of that. [ADA], how do I establish beyond a reasonable doubt that [Appellant is] the one that did it at that time of day?" *Id.* at 75. The ADA argued:

> Just as to the identification, Your Honor, there were multiple witnesses that testified that [Appellant] got into an altercation with Ms. McCoy. There were two other individuals, both [Sheena and Christine] Higgins, that were present for that as well….[Appellant] then goes to [Ms. McCoy's] residence where we—excuse my language—see her on video saying, "Come out here Bitch. Come out here Bitch." She was screaming angrily the entire time. The video does show her leaving, but that doesn't mean that she didn't stay in the area or come back.

- 10 -

And as we heard earlier, Sheena Higgins came home within a couple of minutes of Gerald Stover going upstairs. He said he heard the screaming outside, came downstairs, saw [Appellant] out there, and she eventually left [the front door of the house]. He goes back upstairs, and within just a few minutes, Ms. Sheena Higgins arrives back at [her] residence, which means the car is there. [And Sheena testified that within five minutes of arriving home she heard a "boom" and saw the car on fire.] So, there's not so much as a lapse of time that we can't justify [Appellant] either staying in the area or returning within a few minutes.

Now, the time discrepancy with when the 911 [call] was placed, I would say, Your Honor, that there are explanations for that: There's emotions running high. Perhaps Ms. Higgins called later than she believed that she did, or perhaps there was a timing issue itself on the CAD sheet there. So, I think—because this is not such an extensive period of time, we're not talking hours upon hours here, we're talking about maybe an hour discrepancy, and a couple of minutes of actual action, [Appellant] had a reason to be there: She was angry, and she went looking for a fight to continue after she had started the fight.

There we can see that there is a fire of this vehicle. There was no testimony that there were other altercations happening, and other people involved that could cause a random stranger to set the car on fire. And on top of that, the altercation was initially with Ms. McCoy. We heard testimony from her [that her] vehicle is pretty similar to Ms. Christine Higgins' vehicle.

*Id.* at 77-79.

At the conclusion of the trial, the trial court convicted Appellant on all charges. Appellant filed a post-trial motion seeking reconsideration, which the trial court denied. On December 2, 2024, the trial court sentenced Appellant to an aggregate of two years of probation. On December 12, 2024, Appellant filed a timely, counseled post-sentence motion, which the trial court denied on April 11, 2025. This timely, counseled appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issue in her "Statement of the Questions Involved" (verbatim):

I.     Did the Commonwealth present sufficient evidence at trial to establish beyond a reasonable doubt that [Appellant] was the perpetrator of the offenses?

Appellant's Brief at 5 (unnecessary capitalization and answer omitted).

Initially, we set forth our well-settled standard of review:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brooks*, 7 A.3d 852, 856-57 (Pa.Super. 2010) (citations omitted).

In the case *sub judice*, Appellant's sufficiency argument is specific in nature; to wit, she avers the evidence was insufficient to prove that she committed the crimes. In this vein, she avers the Commonwealth's evidence reveals someone set fire to the car between 1:29 a.m. to 1:30 a.m. on April

16, 2023; however, her exhibit reveals she entered the SAAP Club at 1:31 a.m. ***See*** Appellant's Brief at 18. She avers that the distance between the SAAP Club and the scene of the car fire is approximately 2.2 miles, so it was impossible for her to have set the fire. She argues there is no evidence she was physically in the area when the car was set on fire.

In light of Appellant's specific sufficiency claim, we need not conduct a thorough review of the evidence to determine whether it can support a finding that all of the elements have been met.[2] Rather, we will focus on the specific issue raised by Appellant: whether the evidence was sufficient to establish that Appellant was the perpetrator of the crimes.

---

[2] We note that 18 Pa.C.S.A. § 3301(d)(2) provides the following:

> **(d) Reckless burning or exploding.--**A person commits a felony of the third degree if [s]he intentionally starts a fire or causes an explosion, or if [s]he aids, counsels, pays or agrees to pay another to cause a fire or explosion, whether on h[er] own property or on that of another, and thereby recklessly:…
> (2) places any personal property of another having a value that exceeds $5,000 or if the property is an automobile, airplane, motorcycle, motorboat or other motor-propelled vehicle in danger of damage or destruction.

18 Pa.C.S.A. § 3301(d)(2) (bold in original). Further, 18 Pa.C.S.A. § 3304(a)(1) provides the following:

> **(a) Offense defined.--**A person is guilty of criminal mischief if [s]he:
> (1) damages tangible property of another intentionally, recklessly, or by negligence in the employment of fire, explosives, or other dangerous means listed in section 3302(a) of this title (relating to causing or risking catastrophe)[.]

18 Pa.C.S.A. § 3304(a)(1) (bold in original).

Here, in addressing the issue in its Rule 1925(a) opinion, the trial court

relevantly indicated the following:

> At trial, the Commonwealth called Shataya McCoy, who testified that she got into an altercation with [Appellant] on the earning [*sic*] of April 16, 2023, at Art's Tavern, Pittsburgh. Ms. McCoy left the [tavern] with [Sheena] and Christine Higgins. On cross-examination, Ms. McCoy stated that she saw [Appellant] on the neighbor's Ring video at Ms. McCoy's car, right before the car [at issue] was on fire. Ms. McCoy testified that the video depicted [Appellant] leaving the area of the fire. Ms. McCoy had parked her car, a 2017 dark Mitsubishi Outlander, across the street from her house that night.

> Gerald Stover, [Ms.] McCoy's [son], testified that [Appellant] came to his house on April [16], 2023, at approximately 12:33 a.m., which was viewed on Ring Camera footage. Mr. Stover did not recall what [Appellant] was saying when he met her at the door. Within five minutes of [Appellant] walking away, Mr. Stover return[ed] to the upstairs of the house to his bedroom. Mr. Stover heard a noise, looked out the window, and [saw] the front of a car parked outside on fire.

> Steena [*sic*] Higgins testified that she resided on Chester [Avenue], and [she] was [Ms.] McCoy's neighbor. She testified the time to be around 12:30 a.m. [when she arrived home]. Within five (5) minutes of getting home that morning, she heard a "boom," looked out her window, and saw the car on fire. Ms. Higgins called the police to report the fire.

> Christine Higgins then testified about the fire damage to her car. She testified that rental payments to replace her car totaled $10,000.00. Detective Michael Burns, a City of Pittsburgh police officer, testified as an arson expert. The detective opined that:

>> So, I had come to the conclusion the fire was intentionally set. An ignitable liquid was used to help spread the fire. And that liquid was poured from the top of the roof of the vehicle; it came down on the left side of the vehicle, over the left front fender onto the left tire. And then that liquid was set on fire with an open flame, which could be a lighter or match.

> Detective Burns said the police received the call at 1:37 a.m. and were on scene at 1:41 a.m.

- 14 -

Defense counsel provided Exhibit A, a screenshot photo time stamped 1:31 [a.m.] on April 16, 2023, of [Appellant] at a club on the North Side of the city. This photo was taken allegedly at the "SAAP Club" located at [***] Eckert Street, approximately 2.2 miles from Chester [Avenue], the location of the car fire. The [trial] court was not satisfied as to where the photo depicted in Exhibit A was actually taken. The [trial] court found that the witnesses testified credibly, but [they] were mistaken as to the times of the fire. [Appellant] was angry, had an altercation earlier that evening, [and] going so far as to pound on [Ms. McCoy's] door in the early hours of the morning. [Appellant] was seen near [Ms. McCoy's car] shortly before [Christine Higgins' car, which is the same make and model as Ms. McCoy's car], was burned on the neighbor's Ring video. The [trial] court was satisfied that the Commonwealth provide [*sic*] its case, and found [Appellant] guilty. The [trial] court finds that sufficient direct and circumstantial evidence [of identification] was presented by the Commonwealth.

Trial Court Opinion, filed 8/27/25, at 2-3.

The trial court, as the finder of fact, was free to weigh the testimony, and this Court is bound by the trial court's credibility determinations. **See Brooks**, **supra**. Here, the trial court found that, in the hours prior to the car fire, Appellant had an altercation with Ms. McCoy, who was with her neighbor, Sheena, and Sheena's sister, Christine, at a tavern. N.T., 7/15/24, at 16, 41. During the altercation, Appellant threatened to physically harm Ms. McCoy, as well as Christine. **Id.** With Sheena driving Christine's car, the three friends left the tavern together while Appellant drove away in her own vehicle.

While Sheena was dropping off her passengers at two separate locations, Appellant appeared at the front door of Ms. McCoy's house. The trial court found credible the testimony of Gerald Stover, who indicated Appellant appeared at the front door of his mother's house in a visibly angry state during

the very early morning hours of April 16, 2023. ***Id.*** at 26. After Appellant walked away from the front door, Mr. Stover heard "running; like slapping" outside, and when he looked out the window, he saw his next-door neighbor, Sheena Higgins, arriving home and walking in her front door. ***Id.*** at 27. Mr. Stover then heard the noise of "something hitting something" coming from outside, so he looked out the window and saw the front of a car on fire. ***Id.*** at 28. Mr. Stover clarified that, from the time when he saw Appellant "just walking away" from the front door to the time he observed the car on fire, only five minutes had passed. ***Id.*** It was later determined that the car, which was set ablaze, was Christine's car, which Sheena had just parked near the front of her and Ms. McCoy's homes. There is no dispute that Christine's car was the same make and model as Ms. McCoy's car.

Moreover, the trial court found credible the testimony of Sheena Higgins, who testified that, within less than five minutes of arriving home and going upstairs, she heard the "big boom." ***Id.*** She looked out the window and saw Christine's car on fire. ***Id.***

As the trial court found, Sheena's timeline of events is consistent with Mr. Stover's timeline of events. That is, Sheena arrived home in Christine's car during the five-minute lapse from when Mr. Stover saw Appellant "just walking away" from his front door to the time he saw Christine's car on fire. Sheena, likewise, testified that, within less than five minutes of arriving home and going upstairs, she heard the "big boom." ***Id.***

While the trial court acknowledged there were discrepancies in the testimony of the Commonwealth witnesses regarding the time when the fire was set, the trial court found dispositive Mr. Stover's testimony that he observed the car on fire within five minutes of seeing a visibly angry Appellant walking away from his mother's front door. **See** Trial Court Opinion, filed 8/27/25, at 2-3. The trial court also accepted the testimony that, as Appellant walked away from Ms. McCoy's front door, the next-door neighbor, Sheena, arrived home and parked Christine's car (which looked similar to Ms. McCoy's car) in front of the home. **See id.**

As this Court has recently held:

> [I]n addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes. It is well-settled that "[e]vidence of identi[ty] need not be positive and certain to sustain a conviction." **Commonwealth v. Orr**, 38 A.3d 868, 874 (Pa.Super. 2011) (*en banc*) (citation omitted).
>
> > [E]ven if the Commonwealth presented only circumstantial evidence and offered no positive identification of the [perpetrator], we may not weigh the evidence and substitute our judgment for the fact-finder as long as the evidence was sufficient to prove [the accused's] guilt.
>
> **Commonwealth v. Robertson**, 874 A.2d 1200, 1206 (Pa.Super. 2005); **see also Commonwealth v. Strafford**, 194 A.3d 168, 175-76 (Pa.Super. 2018) ("[A]ny indefiniteness and uncertainty in the identification testimony goes to its weight. Direct evidence of identity is, of course, not necessary and a defendant may be convicted solely on circumstantial evidence.") (citation omitted)).

**Commonwealth v. Torsunov**, 345 A.3d 339, 347-48 (Pa.Super. 2025) (some quotation marks and quotation omitted).

- 17 -

Based on the trial court's credibility determinations and factual findings, which are supported by the record and to which we are bound, we conclude there was sufficient evidence establishing Appellant's identity as the perpetrator of the crimes. **See Torsunov**, **supra**.

We note that Appellant acknowledges in her brief that "[a]ll of the lay witnesses testified that once [Appellant] left, they heard a bang and/or observed the fire five [] minutes after her departure." Appellant's Brief at 18. However, she contends the trial court erred in accepting the lay witnesses' testimony over the testimony of Detective Burns, who opined the fire started between 1:29 a.m. and 1:30 a.m., and, from Appellant's view, since she presented a screenshot of her walking into the SAAP Club at 1:31 a.m., she could not have committed the crime. **See** Appellant's Brief at 18-19.

In essence, Appellant focused her trial strategy and appellate argument on the fact she could not have committed the crime because Defense Exhibit A (a screenshot depicting her entering a club at 1:30 a.m.) is dispositive, but the trial court disagreed. The trial court found there was no evidence supporting Appellant's claim the screenshot was taken at the SAAP Club. **See** Trial Court Opinion, filed 8/27/25, at 2-3. Further, we reiterate that the trial

court, as the finder of fact, was free to weigh the testimony, and this Court is bound by the trial court's credibility determinations.[3] **See Brooks**, **supra**.

Accordingly, viewing the entire record, we conclude the evidence was sufficient to establish Appellant's identity as the perpetrator. **See Torsunov**, **supra**. Thus, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judge Kunselman joins this memorandum.

Judge Sullivan concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 03/11/2026

_____

[3] We note that, by basing her argument on the credibility of the lay witnesses' testimony, Appellant conflates the legally distinct concepts of sufficiency and weight of the evidence. A "challenge to the weight of the evidence is distinct from a challenge to the sufficiency of the evidence in that the former concedes the Commonwealth has produced sufficient evidence of each element of the crime, but questions which evidence is to be believed." **Commonwealth v. Kinney**, 157 A.3d 968, 971 (Pa.Super. 2017) (citation omitted). "[A]n appellant's challenge to the sufficiency of the evidence must fail where an appellant phrases an issue as a challenge to the sufficiency of the evidence, but the argument that the appellant provides goes to the weight of the evidence." **Commonwealth v. Juray**, 275 A.3d 1037, 1043 (Pa.Super. 2022) (internal quotation marks, brackets, and citations omitted). Accordingly, Appellant's sufficiency challenge also fails on this basis.