J-S55006-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BRIAN TOOTLE | |
| Appellant | No. 3030 EDA 2014 |

Appeal from the Judgment of Sentence September 12, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0014103-2012

BEFORE:  LAZARUS, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:            **FILED NOVEMBER 01, 2016**

Brian Tootle appeals from the judgment of sentence, imposed in the Court of Common Pleas of Philadelphia County, after a jury found him guilty of first-degree murder[1] and related charges.[2]  Upon review, we affirm on the basis of the July 2, 2015 supplemental opinion authored by the Honorable Glenn B. Bronson.

The trial court set forth the facts of this case as follows:

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2502.

[2] Tootle was also convicted of one count each of:  criminal conspiracy, 18 Pa.C.S.A. § 903; carrying a firearm without a license, 18 Pa.C.S.A. § 6106; carrying a firearm on the public streets of Philadelphia, 18 Pa.C.S.A. § 6108; and possessing instruments of crime, 18 Pa.C.S.A. § 907.

On July 27, 2012, at approximately 8:37 p.m., Gerald Jones, Nafis Armstead, and several of their friends were outside on the 200 block of East Sharpnack Street in Philadelphia. Earlier, and throughout the day, [Tootle] and two individuals were in a green van driving around the block and parking several times before driving off again. As Jones and Armstead were talking, the van pulled up to the curb and parked. [Tootle] and at least one of the other passengers exited the vehible wearing hats and with bandanas over their faces. They brandished firearms and opened fire on Jones and Armstead. After the shooting stopped, [Tootle] and the other men fled the scene in the van, with [Tootle] driving. Neither Jones nor Armstead were armed at the time.

Police responded to the scene to find Armstead lying in the middle of the road. Armstead was declared dead at 8:58 p.m. Jones was shot a total of five times in the back, leg, arm, and hip. Police placed Jones in the back of a police cruiser and transported him to Einstein Hospital. Information that the shooters were driving a green van was broadcast over police radio as police continued to respond to the scene.

Officer [Tyrone] Boaddus, who was in his patrol car responding to the radio call regarding the shooting, observed a green van matching the description of the getaway vehicle. He followed the van to the parking lot of an apartment building, where it stopped. [Tootle] and another man then got out of the van and [Tootle] walked toward the back of the lot. Additional officers arrived, and [Tootle] was located and apprehended. No other individuals were apprehended at that time.

At the time of his arrest, [Tootle] gave police the false name of Brandon Harris. As [Tootle] was taken into custody, [he] asked the arresting officers: "Can I say my last good-byes to my cousin?" [Tootle] also asked how many people were shot and if anyone was killed. Michael Jordan, a witness to the shooting's aftermath and [Tootle's] flight in the van, was taken to where the van was located, where he identified the van as the vehicle he saw leaving the scene of the shooting.

. . .

Police recovered two firearms. A loaded .40 caliber Glock with an extended magazine was recovered inside of [Tootle's] vehicle. [Tootle's] fingerprints were recovered from that Glock. Additionally, police recovered a .357 caliber six shot revolver,

- 2 -

with six spent cartridge cases in the cylinder, approximately ten feet from where [Tootle] was apprehended. Police also recovered a cell phone from the vehicle which bore fingerprints from [Tootle's] thumb. Police recovered and identified eighteen .40 caliber fired cartridge cases. A bullet jacket and core recovered from Armstead's head by the medical examiner matched the revolver recovered near [Tootle]. Bullets recovered from Armstead's torso, chest, and leg were consistent with the .40 caliber Glock having [Tootle's] fingerprint. In addition, all of the recovered .40 caliber fired cartridge cases were fired from the Glock. The clothing [Tootle] was wearing at the time of his arrest was seized and tested for gunpowder residue. Gunpowder residue was found on [Tootle's] black T-shirt and sweatpants.

Trial Court Opinion, 7/2/15, at 3-5.

Following a jury trial, on July 3, 2014, Tootle was convicted of the aforementioned offenses. On September 12, 2014, the trial court sentenced him to an aggregate sentence of life without parole plus 24½ to 52 years' incarceration. Tootle did not file post-sentence motions, but filed a notice of appeal to this Court on October 12, 2014. After he failed to file a court-ordered statement of issues complained of on appeal pursuant to Pa.R.A.P. 1925(b), the trial court issued a Rule 1925(a) opinion finding all appellate issues to have been waived.

By *per curiam* order filed February 19, 2015, this Court granted counsel's motion to withdraw and directed the trial court to determine whether Tootle was eligible for court-appointed counsel. Following a hearing, the trial court appointed Henry M. Sias, Esquire, to represent Tootle on appeal. Attorney Sias subsequently applied to this Court to remand the matter to the trial court for the filing of a Rule 1925(b) statement, *nunc pro tunc*, and the issuance of a supplemental Rule 1925(a) opinion by the trial

court. This Court granted the application on May 18, 2015. Counsel subsequently filed a Rule 1925(b) statement and the trial court issued a supplemental Rule 1925(a) opinion.

On appeal, Tootle raises the following issues for our review:

1. Was the evidence insufficient to support a verdict of [f]irst[-d]egree [m]urder?

2. Did the trial court err in excusing Juror 8, after individual questioning confirmed that she would be fair, in violation of the Sixth Amendment and Article I, Section 6 of the Pennsylvania Constitution; further, did excusing the juror having the effect of seeming to punish a member of the jury for criticizing the conduct of the representative of the Commonwealth, to the derogation of the jury's impartiality?

3. Did the trial court err in denying [Tootle's] motion[] for mistrial[?]

4. Was the weight of the evidence against the verdict, given the polluted and corrupt nature of the sole testimony placing [Tootle] at the scene of the crime?

5. Did the trial court err in allowing the Commonwealth to reopen its case after it had rested[?]

Brief of Appellant, at 5.

We have reviewed the record and the briefs submitted by the parties. In his supplemental Rule 1925(a) opinion, Judge Bronson properly concludes that: (1) the evidence was sufficient to convict Tootle of first-degree murder, **see** Trial Court Opinion, 7/2/15, at 5-8; (2) the court's decision to excuse Juror 8 was not an abuse of discretion, **see id.** at 9-10; (3) the court did not err in declining to grant Tootle's motion for mistrial, **see id.** at 11-12; (4) Tootle's weight of the evidence claim is waived for failure to preserve

it through the filing of post-sentence motions, *see id.* at 8-9; and (5) the court did not err in permitting the Commonwealth to reopen its case after defense counsel disputed the scope of a stipulation regarding the testimony of latent fingerprint technician Patrick Raytik, *see id.* at 12-13.

In his supplemental opinion, Judge Bronson thoroughly and correctly disposes of all issues Tootle raises on appeal. Accordingly, we affirm on the basis of his well-reasoned opinion and instruct the parties to attach a copy in the event of further proceedings in this matter.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/1/2016

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF         :         CP-51-CR-0014103-2012
PENNSYLVANIA

      CP-51-CR-0014103-2012 Comm. v. Tootle, Brian
      Supplemental Opinion

v.



7315482921

BRIAN TOOTLE

SUPPLEMENTAL OPINION

**FILED**

**JUL 02 2015**

**Post Trial Unit**

BRONSON, J.                                July 2, 2015

On July 3, 2014, following a jury trial before this Court, defendant Brian Tootle was convicted of one count of first degree murder (18 Pa.C.S. § 2502), one count of criminal conspiracy (18 Pa.C.S. § 903), one count of carrying a firearm without a license (18 Pa.C.S. § 6106), one count of carrying a firearm on the public streets of Philadelphia (18 Pa.C.S. § 6108), and one count of possessing an instrument of crime (18 Pa.C.S. § 907). On September 12, 2014, the Court sentenced defendant to an aggregate sentence of life without parole plus 24 ½ to 52 years incarceration. Defendant did not file post-sentence motions.

Defendant filed a Notice of Appeal on October 12, 2014. The Court ordered defendant to file a Statement of Errors Complained of on Appeal ("Statement of Errors") by November 4, 2014. On October 31, 2014, defendant filed a motion for an extension of time to file a Statement of Errors. The Court granted the request and set a new deadline of November 13, 2014. On December 15, 2014, with no Statement of Errors having been received by the Court, the Court filed an Opinion pursuant to Pa.R.A.P. 1925(a) finding all issues to have been waived.

On February 19, 2015, the Superior Court granted defense counsel's motion to withdraw and directed this Court to determine whether defendant was eligible for court appointed counsel. Following a hearing on April 2, 2015, the Court appointed Henry M. Sias, Esquire, to represent defendant on appeal. Mr. Sias petitioned the Superior Court to remand this matter to the trial court for the filing of a Statement of Errors *nunc pro tunc* and the filing of an additional opinion by the trial court. That petition was granted by the Superior Court on May 21, 2014.

On June 8, 2015, defendant filed a Concise Statement of Errors Complained of on Appeal ("Statement of Errors"), which raises the following grounds for relief: 1) the evidence was insufficient to support the verdict of first degree murder; 2) the verdict was against the weight of the evidence; 3) the Court erred in excusing a juror during the trial; 4) the Court erred in denying defendant's motion for mistrial; and 5) the Court erred in permitting the Commonwealth to reopen its case-in-chief after it had rested.[1]

For the reasons set forth below, defendant's claims are without merit and the judgment of sentence should be affirmed.

## I. FACTUAL BACKGROUND

At trial, the Commonwealth presented the testimony of Philadelphia Police Detective Norma Serrano, Philadelphia Police Officers L'tanya Cousins, Synell Hall, Eric Person, Elena Rodriguez, Tyrone Boraddus, Lesinette Ortiz, Daisy Medycki, Johnathan Berryman, and Matt McCuen, Chief Medical Examiner Dr. Sam Gulino, Sharon Armstead, Michael Jordan, Gamal Emira, Gerald Jones, Ann Marie Barnes, Christina Dorman, and Patrick Raytik. Defendant recalled Detective Serrano. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

---

[1] Defendant's claims have been reordered for ease of analysis.

2

On July 27, 2012, at approximately 8:37 p.m., Gerald Jones, Nafis Armstead, and several of their friends were outside on the 200 block of East Sharpnack Street in Philadelphia. N.T. 7/2/14 at 16-17, 30. Earlier, and throughout that day, defendant and two individuals were in a green van driving around the block and parking several times before driving off again.[2] 7/2/14 at 88, 93. As Jones and Armstead were talking, the van pulled up to the curb and parked. Defendant and at least one of the other passengers exited the vehicle wearing hats and with bandanas over their faces. N.T. 7/2/14 at 17, 21, 88-89. They brandished firearms and opened fire on Jones and Armstead. N.T. 7/2/14 at 17-18, 23, 88-89. After the shooting stopped, defendant and the other men fled the scene in the van, with defendant driving. N.T. 7/1/14 at 100-102; 7/2/14 at 18, 89. Neither Jones nor Armstead were armed at the time. N.T. 7/2/14 at 23-24.

Police responded to the scene to find Armstead lying in the middle of the road. N.T. 7/1/14 at 100, 146; 7/2/14 at 80, 89. Armstead was declared dead at 8:58 p.m. N.T. 6/30/14 at 105. Jones was shot a total of five times in the back, leg, arm, and hip. N.T. 7/2/14 at 16-17. Police placed Jones in the back of a police cruiser and transported him to Einstein Hospital. N.T. 7/1/14 at 101, 115-116; 7/2/14 at 19-20, 80-81. Information that the shooters were driving a green van was broadcast over police radio as police continued to respond to the scene. N.T. 7/1/14 at 196; 7/2/14 at 81.

Officer Boaddus, who was in his patrol car responding to the radio call regarding the shooting, observed a green van matching the description of the getaway vehicle. He followed the van to the parking lot of an apartment building, where it stopped. N.T. 7/1/14 at 196-197. Defendant and another man then got out of the van and defendant walked toward the back of the lot. N.T. 7/1/14 at 197, 201, 204. Additional officers arrived, and defendant was located and

---

[2] Defendant was also identified as "Poodie." N.T. 7/2/14 at 90.

3

apprehended. N.T. 7/1/14 at 201; 7/2/14 at 173. No other individuals were apprehended at that time. N.T. 7/1/14 at 204.

At the time of his arrest, defendant gave police the false name Brandon Harris. N.T. 7/1/14 at 205. As defendant was taken into custody, defendant asked the arresting officers: "Can I say my last good-byes to my cousin?" N.T. 7/1/14 at 135-136; 7/2/14 at 69. Defendant also asked how many people were shot and if anyone was killed. N.T. 7/2/14 at 174-175. Michael Jordan, a witness to the shooting's aftermath and defendant's flight in the van, was taken to where the van was located, where he identified the van as the vehicle he saw leaving the scene of the shooting. N.T. 7/1/14 at 110, 117.

The decedent, Armstead, was shot a total of seven times. N.T. 6/30/14 at 107. He suffered a graze wound to his ear, a shot to his right temple and eye, a shot to the back of his head that penetrated his brain, a shot to his chest that penetrated his superior vena cava, a shot to his right back that severed his spinal column, and two shots to his right thigh. N.T. 6/30/14 at 107-111. Armstead had stippling on his left forearm, which indicated that the arm was in close proximity to a firing gun. N.T. 6/30/14 at 112.

Police recovered two firearms. A loaded .40 caliber Glock with an extended magazine was recovered inside of defendant's vehicle. N.T. 7/1/14 at 18-19, 202. Defendant's fingerprints were recovered from that Glock. N.T. 7/1/14 at 20, 22; 7/2/14 at 200. Additionally, police recovered a .357 caliber six shot revolver, with six spent cartridge cases in the cylinder, approximately ten feet from where defendant was apprehended. N.T. 7/1/14 at 25-28, 48-49, 202; 7/2/14 at 174. Police also recovered a cell phone from the vehicle which bore fingerprints from defendant's thumb. N.T. 7/1/14 at 46-47; 7/3/14 at 54-55, 69-70. Police recovered and identified eighteen .40 caliber fired cartridge cases. N.T. 7/1/14 at 147; 7/2/14 at 59. A bullet

4

jacket and core recovered from Armstead's head by the medical examiner matched the revolver recovered near defendant. N.T. 7/2/14 at 54, 56. Bullets recovered from Armstead's torso, chest, and leg were consistent with the .40 caliber Glock having defendant's fingerprint. N.T. 7/2/14 at 56, 58-59. In addition, all of the recovered .40 caliber fired cartridge cases were fired from the Glock. N.T. 7/2/14 at 59-60. The clothing defendant was wearing at the time of his arrest was seized and tested for gunpowder residue. N.T. 7/1/14 at 168. Gunpowder residue was found on defendant's black T-shirt and sweatpants. N.T. 7/1/14 at 173, 175-176.

## II. DISCUSSION

### A. *Sufficiency of the Evidence*

Defendant first claims on appeal that the "evidence was insufficient to support the verdict of First Degree Murder." Statement of Errors at ¶ 1. This claim is without merit.

In considering a challenge to the sufficiency of the evidence, the Court must decide whether the evidence at trial, viewed in the light most favorable to the Commonwealth, together with all reasonable inferences therefrom, could enable the fact-finder to find every element of the crimes charged beyond a reasonable doubt. *Commonwealth v. Walsh*, 36 A.3d 613, 618 (Pa. Super. 2012) (quoting *Commonwealth v. Brumbaugh*, 932 A.2d 108, 109 (Pa. Super. 2007)). In making this assessment, a reviewing court may not weigh the evidence and substitute its own judgment for that of the fact-finder, who is free to believe all, part, or none of the evidence. *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011). "[A] mere conflict in the testimony of the witnesses does not render the evidence insufficient…" *Commonwealth v. Montini*, 712 A.2d 761, 767 (Pa. Super. 1998). The Commonwealth may satisfy its burden of proof entirely by circumstantial evidence. *Ramtahal*, 33 A.3d at 607. "If the record contains support for the verdict, it may not be disturbed." *Commonwealth v. Adams*, 882 A.2d 496, 499 (Pa. Super.

5

2005) (quoting *Commonwealth v. Burns*, 765 A.2d 1144 (Pa. Super. 2000), *appeal denied*, 782 A.2d 542 (Pa. 2001)).

"The evidence is sufficient to establish first-degree murder where the Commonwealth proves that (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with the specific intent to kill." *Commonwealth v. Edwards*, 903 A.2d 1139, 1146 (Pa. 2006) (quoting 18 Pa.C.S. § 2502(d)). The specific intent to kill can be inferred "from the manner in which the homicide was committed, such as, multiple gunshot wounds." *Commonwealth v. Hughes*, 865 A.2d 761, 793 (Pa. 2004). Moreover, specific intent to kill may be inferred from a defendant's use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Robertson*, 874 A.2d 1200, 1207 (Pa. Super. 2005).

Here, there was overwhelming evidence that defendant shot and killed Armstead on the 200 block of East Sharpnack Street with the specific intent to kill. Prior to the actual shooting, eyewitness Christina Dorman saw defendant's van make several tours of the block. N.T. 7/2/14 at 88, 93. Dorman, who had known defendant for several years before the shooting, also testified that she recognized defendant after he had stepped out of the van, despite the bandana covering his face. N.T. 7/2/14 at 89-90. Under cross-examination, Dorman further testified that defendant was the individual driving the van, both before and after the shooting. N.T. 7/2/14 at 141. Dorman additionally testified that she witnessed defendant and two other men shoot Armstead and Jones over sixteen times. N.T. 7/2/14 at 89.

Gerald Jones testified similarly, stating that he observed a "greenish" van pull up and sit for a few moments before two individuals exited the van. N.T. 7/2/14 at 17-18. Jones testified that these individuals had bandanas covering their faces. N.T. 7/2/14 at 17. Jones testified that he began to flee as these individuals opened fire. N.T. 7/2/14 at 17-18. Jones would later

6

identify a photo of the van that defendant drove as the van from which the shooters emerged. N.T. 7/2/14 at 19.

Michael Jordan, a resident of the neighborhood, heard the gunshots and witnessed a dark green minivan drive away. N.T. 7/1/14 at 100, 102, 104. After police brought Jordan to the location where defendant was arrested, Jordan identified the van as the vehicle that he saw flee the scene of the shooting. N.T. 7/1/14 at 109-110.

Relying on the flash information broadcast over police radio, Officer Tyrone Broaddus testified that he observed defendant driving a green minivan at the corner of Emlen Street and Carpenter Lane. N.T. 7/1/14 at 196-198. Officer Broaddus testified that he immediately made a U-turn and followed the van as it eventually pulled into an apartment complex parking lot on Rosemary Lane. N.T. 7/1/14 at 196-197. Officer Broaddus then witnessed defendant exit the driver side door and walk further into the parking lot. N.T. 7/1/14 at 197, 201. Officer Broaddus testified that, with the assistance of additional responding officers, defendant was taken into custody. N.T. 7/1/14 at 201. In searching the van and area where defendant was arrested, Officer Broaddus testified that he observed a Glock handgun with an extended magazine in the van and a revolver approximately ten feet from where defendant was arrested. N.T. 7/1/14 at 202.

Officer Broaddus testified that, as police confronted defendant, defendant provided the alias "Brandon Harris." N.T. 7/1/14 at 205. In addition, both Officer Eric Person and Officer Lesinette Ortiz testified that defendant asked to "say his last good-bye's" to his cousin as he was being taken into custody. N.T. 7/1/14 at 135-136; 7/2/14 at 69. Officer Matthew McCuen testified that while defendant was detained at the scene, he asked to know how many people had been shot and if anyone was killed. N.T. 7/2/14 at 174-175.

The above testimony was fully corroborated by the physical evidence. As stated above, police recovered both murder weapons in close proximity to defendant. The Glock was in the van that defendant had been driving and the revolver was ten feet from where defendant was apprehended. N.T. 7/1/14 at 16-18, 202. Defendant's fingerprint was found on the Glock. Defendant's fingerprint was also lifted from a cell phone that was recovered from the van. N.T. 7/2/14 at 200; 7/3/14 at 54-55. A subsequent ballistics examination of the firearms revealed that the bullet which penetrated Armstead's head was fired from the revolver. N.T. 7/2/14 at 54, 56. The .40 caliber bullet recovered from Armstead's chest was also consistent with the Glock. N.T. 7/2/14 at 58-59. Additionally, the ballistics examination revealed that all eighteen of the recovered .40 caliber fired cartridge cases from the scene of the shooting were fired from the Glock. N.T. 7/2/14 at 59-60. Gunshot residue was found on the T-shirt and sweatpants that defendant was wearing when he was arrested. N.T. 7/1/14 at 168, 175-176.

The above evidence was sufficient for the jury to find, well beyond a reasonable doubt, that defendant shot and killed Armstead on the 200 block of East Sharpnack Street. Defendant's specific intent to kill was clearly established by his shooting Armstead multiple times in the head and chest, both vital areas of the human body.

B. *Weight of the Evidence*

Defendant also asserts that the verdict was against the weight of the evidence as the "sole testimony placing the defendant at the scene of the crime" was polluted and corrupt. Statement of Errors at ¶ 4. Defendant did not file a post-sentence motion challenging the weight of the evidence in this matter. Because defendant's claim was never raised in the trial court, it is waived for purposes of appeal. *See* Pa.R.A.P. 607; *Commonwealth v. Griffin*, 65 A.3d 932, 938 (Pa. Super. 2013), *appeal denied*, 76 A.3d 538 (Table) (Pa. 2013) ("A weight of the evidence

8

claim must be preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing.").

In any event, defendant's weight claim is frivolous. As stated above, the evidence overwhelmingly established that defendant was guilty as charged.

C. *Dismissal of Juror Number 8*

Defendant next asserts that the Court "erred in excusing Juror 8, after individual questioning confirmed that she would be fair...; further, excusing the juror had the effect of seeming to punish a member of the jury for criticizing the conduct of the representative of the Commonwealth, to the derogation of the jury's impartiality." Statement of Errors at ¶ 2. This claim is without merit.

"The decision to discharge a juror is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. This discretion exists even after the jury has been impanelled and the juror sworn." *Commonwealth v. Carter*, 643 A.2d 61, 70 (Pa. 1994) (internal citations omitted). "[T]he common thread of the cases is that the trial judge, in his sound discretion, may remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." *Bruckshaw v. Frankford Hosp. of City of Philadelphia*, 58 A.3d 102, 110-11 (Pa. 2012), *quoting United States v. Cameron*, 464 F.2d 333, 335 (3d Cir. 1972).

During trial, Juror No. 8 told a court officer that she saw the Assistant District Attorney, Richard Sax, making faces during trial and that she found these faces distracting. N.T. 7/2/14 at 116-117. After Juror No. 8's complaint was reported to counsel, the Commonwealth moved to excuse the juror and proceed with an alternate, which defendant opposed. N.T. 7/2/14 at 117-118. The Court then conducted an examination of the juror, outside the presence of the rest of

the jury. Juror No. 8 stated that she had seen Mr. Sax's reactions to the questions that were being asked and "felt that it seemed like it was very disparaging to the questioners, to the counsels, and like [Mr. Sax] was very exasperated or whatever was being asked was ridiculous and his faces I just find very annoying and it's difficult to avoid them." N.T. 7/2/14 at 118-119. Upon questioning by the Court, the juror stated that she would not let the behavior of the prosecutor affect her view of the evidence and that she could be fair. N.T. 7/2/14 at 120-122. However, the Court observed that after being asked whether she could disregard her impression of the prosecutor and be fair, Juror No. 8 "made a face and hesitated before answering." N.T. 7/2/14 at 122-123. The Court specifically found that the juror's reaction to the prosecutor was "extraordinary," and that "the expression on this juror's face and the hesitation with which she deliberated before answering my question … gives me great concern that she could be fair and impartial…." N.T. 7/2/14 at 125-126. The Court, therefore, dismissed Juror No. 8 and substituted Juror No. 13. N.T. 7/2/14 at 126. Upon the resumption of trial, the Court instructed the jury that it had excused a juror and that the remainder of the jury should not concern itself with the matter in any way. N.T. 7/2/14 at 128-129.

Accordingly, the record establishes that after a juror took the extraordinary measure of reporting to a court officer that the appearance of the prosecutor was distracting her during the trial, the court held a hearing to explore the matter after the Commonwealth moved to exclude her from the trial. After interrogating the juror, the Court found, based on the demeanor and behavior of the juror, that her statement that she could be fair was not credible, and therefore excused her. Because the Court's decision was based upon a factual finding, supported by the record, that Juror No. 8's ability to perform her duty impartially was impaired, the decision was well within the discretion of the Court. No relief is due.

10

D. *Motion for Mistrial*

Defendant next asserts that the Court "erred in denying the defendant's motions for mistrial." Statement of Errors at ¶ 3. Specifically, defendant cites to the portion of the record in which defendant moved for a mistrial due to the alleged failure of the Commonwealth to establish the chain of custody for a cell phone that was recovered from the van that defendant was driving at the time of the murder, and which contained defendant's fingerprints.[3] *Id.; see* N.T. 7/3/14 at 8-26. This claim is without merit.

"A mistrial is an extreme remedy ... [that] ... must be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial." *Commonwealth. v. Manley*, 985 A.2d 256, 266 (Pa, Super. 2009) (internal citations and quotations omitted). Here, defendant's request for a mistrial failed to identify anything in the trial that was in any way unfair or unlawful.

The cell phone at issue was never offered into evidence. It is true that Officer John Taggart of the Crime Scene Unit testified that he recovered a cell phone underneath a shirt inside of the van, and that he lifted fingerprints off of that phone that were subsequently identified by Patrick Raytik, a latent fingerprint technician. N.T. 7/1/14 at 20, 23, 25. However, at the time that defendant moved for a mistrial, both sides had rested without Raytik having testified. While Raytik's report had been admitted into evidence without objection (Commonwealth Exhibit C-32), and identified two prints from the cell phone as belonging to defendant, the jury had never heard during the trial that defendant's print was on the phone.[4] Because the jury had heard no

---

[3] Defendant's Statement of Errors states that the Court denied defendant's "motions" for mistrial. However, defendant only moved for mistrial once, relating to the chain of custody issue of the cell phone found in defendant's van.

[4] The prosecutor did ask Officer Taggert, referring to the phone, "whether there were any other fingerprints attributed by Officer [sic] Raytik to someone who we'll get to later on in this case." N.T. 7/1/15 at 22. However, when a stipulation was read later in the case regarding Raytik's report, it referred only to the fingerprint on the Glock and made no mention of the phone. N.T. 7/2/14 at 200.

11

evidence linking defendant to the cell phone prior to the time that defendant moved for a mistrial, any infirmities regarding the chain of custody pertaining to that phone could not have prejudiced him. Accordingly, his motion for a mistrial was completely without merit.[5]

E.    *Permitting the Commonwealth to Reopen its Case-in-Chief*

Defendant's final issue on appeal states that the Court erred in permitting the Commonwealth to reopen its case after both parties had rested. Supplemental Statement of Errors at ¶ 5. This claim is without merit.

"[T]he reopening of a case after the parties have rested, for the taking of additional testimony, is within the trial court's discretion; this Court has couched the exercise of this discretion in terms of 'prevent[ing] a failure or miscarriage of justice.'" *Commonwealth v. Baldwin*, 58 A.3d 754, 763 (Pa. 2012), quoting *Commonwealth v. Chambers*, 685 A.2d 96, 109 (Pa. 1996); *see Commonwealth v. Tharp*, 575 A.2d 557, 558-559 (Pa. 1990) (permitting the Commonwealth to reopen after failing to prove an essential element of an offense in its case-in-chief). In determining whether or not to permit a party to reopen its case, the Court may consider such factors as the timing of the request to open, the nature of the proffered testimony compared to its potential for disruption or prejudice, as well as the party's reason for failing to present the evidence during its case-in-chief. *Baldwin.* 58 A.3d at 763-64.

Here, the Commonwealth sought to reopen its case after a dispute with the defense over a stipulation regarding the testimony of Patrick Raytik, the latent fingerprint technician who identified fingerprints lifted from one of the murder weapons and from the cell phone recovered from the van, as belonging to defendant. Raytik's entire report was admitted into evidence without objection from the defense. N.T. 7/2/2014 at 229-230. However, when the prosecutor

---

[5] As we discuss below, *after* defendant's motion for a mistrial, the Court permitted the Commonwealth to reopen and evidence that defendant's print was on the phone was admitted. Whether the Commonwealth was properly permitted to reopen is discussed in Section E, below.

12

recited a stipulation as to Raytik's testimony, he referenced the report, but only stated Raytik's opinion regarding the fingerprint found on the murder weapon, making no mention of the fingerprints from the phone. N.T. 7/2/14 at 199-200. The next day, right before closing arguments, defense counsel, in making the motion for a mistrial discussed in section II.D., above, denied stipulating to the cell phone prints, and argued that the Commonwealth failed to prove a chain of custody sufficient to connect any of Raytik's analysis to prints lifted from the cell phone taken from the van. N.T. 7/3/14 at 8-37. The Commonwealth, on the other hand, argued that defense counsel had agreed to stipulate to Raytik's entire report, which rendered any chain of custody issues moot. The prosecutor averred that he did not call Raytik as a witness the day before in reliance on defense counsel's agreement, even though Raytik was present in court and available to testify for six hours. N.T. 7/3/14 at 21-23, 31-32.

Clearly the prosecutor and defense counsel had a misunderstanding regarding the scope of their stipulation regarding the fingerprint evidence. For that reason, the Court concluded that it was fair to both sides to permit the Commonwealth to reopen to offer evidence on the matters that were purportedly covered by the stipulation, that is, Raytik's opinion regarding the prints taken off of the telephone, as well as any additional testimony necessary to establish that the prints that he analyzed were the prints that had been lifted from the phone. N.T. 7/3/14 at 35-41. The additional presentation of evidence took less than one half hour to present to the jury, and was followed immediately by closing arguments. N.T. 7/3/14 at 44-72. Accordingly, there was only *de minimis* disruption of the trial, and defendant was not prejudiced in any way. No relief is due.

13

## III. CONCLUSION

For all of the foregoing reasons, the Court's judgment of sentence should be affirmed.

BY THE COURT:

GLENN B. BRONSON, J.

14

Commonwealth v. Brian Tootle          CP-51-CR-0014103-2012
Type of Order: 1925(a) Opinion

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P.114:

**Defense Counsel/Party:**

        Henry M. Sias, Esquire
        1308 S. 8th St.
        Philadelphia, PA 19147

Type of Service:      ( ) Personal (**X**) First Class Mail ( ) Other, please specify:

**District Attorney(s):**

        Hugh J. Burns, Jr., Esquire
        Chief, Appeals Unit
        Philadelphia District Attorney's Office
        Three South Penn Square
        Philadelphia, PA 19107

Type of Service       () Personal (**X**) First Class Mail ( ) Other, please specify:

**Additional Counsel/Party:**

        Joseph D. Seletyn, Esquire
        Prothonotary
        Office of the Prothonotary – Superior Court
        530 Walnut Street, Suite 315
        Philadelphia, PA 19106

Type of Service:      ( ) Personal (**X**) First Class Mail ( ) Other, please specify:

**Dated: June 2, 2015**

Jonathon M. Frisby
Law Clerk to Hon. Glenn B. Bronson