J-S14044-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARK JULIAN BETHUNE | : | |
| | : | |
| Appellant | : | No. 1233 MDA 2023 |

Appeal from the Judgment of Sentence Entered August 1, 2023
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0001764-2020

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARK BETHUNE | : | |
| | : | |
| Appellant | : | No. 1234 MDA 2023 |

Appeal from the Judgment of Sentence Entered August 1, 2023
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0005058-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARK BETHUNE | : | |
| | : | |
| Appellant | : | No. 1235 MDA 2023 |

Appeal from the Judgment of Sentence Entered August 1, 2023
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0000623-2022

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:        **FILED: JUNE 17, 2024**

Mark Bethune (Appellant) appeals from the judgments of sentence imposed following his convictions by a jury of (a) one count each of aggravated assault (attempts to cause serious bodily injury) and simple assault[1] at CP-22-CR-0005058-2021 (No. 5058); (b) one count each of criminal attempt (homicide), aggravated assault (attempts to cause or causes bodily injury with a deadly weapon)[2] at CP-22-CR-0000623-2022 (No. 623); and (c) one count each of possession of an instrument of crime (PIC) and access device fraud[3] at CP-22-CR-0001764-2020 (No. 1764) (the credit card offenses).  We affirm.

## No. 1764 – The Credit Card Offenses

The trial court summarized the trial testimony pertaining to the credit card offenses:

> Blaine Heller, who was working as a bartender at the Underdog Sports Bar on June 12, 2020, testified that he recalled selling two six packs of beer to an individual and, shortly thereafter, received a call regarding that purchase.  (N.T., 6/30/22, pp. 19-21) (Commonwealth's Exh. No. 1).  Specifically, the individual in the call reported that someone had just used their credit card to make the purchase of the six packs of beer.  (*Id.*).  … Mr. Heller testified that the individual who made the beer purchase came into the bar the following evening, June 13, 2020, and ordered takeout [food].  (*Id.* at 24-25).  While the individual

---

[1]  *See* 18 Pa.C.S.A. §§ 2702(a)(1), 2701(a)(1).

[2] *See* 18 Pa.C.S.A. §§ 901, 2702(a)(4).

[3] *See* 18 Pa.C.S.A. §§ 907(a), 4106(a)(1)(i).

waited for the food, because Mr. Heller recognized the individual from the night before, the police were contacted. (*Id.*). He identified the receipt from the purchase the individual made on June 13, 2020. (*Id.* at 26) (Commonwealth's Exh. No. 4).

Shannon Graybill confirmed that a credit card linked to her financial account was used on June 12, 2020 at the Underdog Sports Bar. (*Id.* at 35). She explained that prior to getting divorced, her married name was Shannon Lego. (*Id.* at 34). She testified that the signature on the receipt for the credit card purchase of the two six packs of beer on June 12, 2020 was not hers, nor had she ever visited the Underdog Sports Bar. (*Id.* at 33-35) (Commonwealth Exh. No. 2). Ms. Graybill further identified a second receipt from Underdog Sports Bar which was for her credit card but did not contain her signature. (*Id.* at 35) (Commonwealth's Exh. No. 4).

Trial Court Opinion, 10/30/23, at 3-4.

Corporal Shawn Moore testified regarding his investigation of the incident:

Corporal [] Moore testified that he was dispatched to the Underdog Sports Bar on June 12, 2020 for a complaint that a credit card was used without an individual's permission. ([N.T., 6/30/22,] at 36-37). He spoke with Mr. Heller and collected the receipt in question; he then told Mr. Heller that if the gentleman who used the credit card returned, to contact him. (*Id.* at 37). Corporal Moore responded to the Underdog Sports bar again on June 13, 2020, after he received a call from Mr. Heller that the gentleman returned to the bar. (*Id.* at 38). Corporal Moore identified the Appellant as the gentleman who had used the credit card on June 12 and 13, 2020. (*Id.* at 39). Corporal Moore placed Appellant under arrest and upon [executing] a search incident to arrest, he found eight (8) credit cards on the Appellant, five (5) of which had different names on them. (*Id.* at 39) (Commonwealth's Exh. Nos. 5, 6, and 7).

Corporal Moore entered the cards into evidence and then ran them through the card reader at the police station. (*Id.* at 40). He explained that when you run the magnetic strip through the card reader, it provides the information of who the account belongs to. (*Id.* at 41). One of the cards that Corporal Moore

- 3 -

recovered had the name John Morton on it; however, after running it through the card reader, the account was associated with Shannon Lego. (*Id.* at 42).

Trial Court Opinion, 10/30/23, at 4.

On August 27, 2020, Appellant was charged at No. 1764 with one count of forgery,[4] four counts of PIC, and two counts of access device fraud. The matter proceeded to a jury trial on June 30, 2022. That same day, the jury convicted Appellant of one count each of PIC and access device fraud, but the jury could not reach a verdict on Appellant's second count of access device fraud and the charge of forgery.

### Nos. 5058 and 623

On August 5, 2021, Kassandra Jimenez (Jimenez)[5] and Darrious Neville (Neville) sat at a table inside Bill's Café in Harrisburg, Pennsylvania. Appellant entered the café and cut Neville on the side of the neck with an unidentified sharp object. When Jimenez and Neville began to chase Appellant, Appellant turned and cut Jimenez on the forehead before fleeing the scene. Neville drove himself and Jimenez to the hospital for treatment. Both required sutures. On August 19, 2021, Jimenez identified Appellant as the perpetrator from a photo line-up.

---

[4] 18 Pa.C.S.A. § 4101.

[5] Various documents have spelled the name, "Jiminez." However, our review of the trial transcript discloses that the victim spelled her name as "Jimenez." N.T., 2/1-2/23, at 60.

- 4 -

At No. 623, the Commonwealth charged Appellant with respect to his attempted murder and aggravated assault of Neville. At No. 5058, the Commonwealth charged Appellant with respect to aggravated assault of Jimenez. On January 18, 2023, the trial court joined Nos. 623 and 5058 for trial. The matter proceeded to a jury trial on February 1, 2023. On February 2, 2023, the jury convicted Appellant on all counts. The jury specifically found that Appellant committed serious bodily injury to Neville. *See* N.T., 2/1-2/24, at 284.

## Sentencing

On August 1, 2023, at No. 623 (Neville), the trial court sentenced Appellant to 20-40 years in prison for his conviction of attempted murder. For his conviction of aggravated assault, the trial court imposed a consecutive 6-12 years in prison. For his convictions at No. 5058 (Jimenez), the trial court imposed an aggregate 1-2 years in prison, to be served concurrent with Appellant's sentence for attempted murder at No. 623. The trial court imposed no further sentence for Appellant's simple assault conviction. The court granted Appellant time credit of 19 months and 29 days.

At No. 1764 (the credit card offenses), for his conviction of PIC, the trial court sentenced Appellant to 1-2 years in prison. For his conviction of access device fraud, the trial court sentenced Appellant to 1-2 years in prison, to be served concurrently with his sentence for PIC. The trial court directed that Appellant's aggregate 1-2-year prison term be served concurrently with his

attempted murder sentence at No. 623.  The trial court granted time credit of 13 months and 5 days.

Appellant timely filed post-sentence motions in all cases, which the trial court denied on August 16, 2023.  Appellant timely filed notices of appeal at each docket number.[6]  Appellant and the trial court have complied with Pa.R.A.P. 1925.[7]

Appellant presents the following issues:

A. [At No. 1764 (credit card offenses),] [s]hould the offense of [PIC] and access device fraud have merged [at sentencing,] when the basis of the access device fraud would involve the criminalized use of credit cards?

B. Was the evidence insufficient to constitute attempt to murder[,] when the Commonwealth failed to prove specific intent to kill when, in the totality of the circumstances, [Appellant's] actions reflect an intent to only cause serious bodily injury?

C. Was there insufficient evidence that Mr. Bethune acted with [*sic*] the injury in question [to Jimenez] left a minor scar which healed on its own and does not qualify as a "disfigurement," for purposes of constituting serious bodily injury?

Appellant's Brief at 6 (issues renumbered).

---

[6] *See **Commonwealth v. Walker***, 185 A.3d 969, 977 (Pa. 2018) (stating that when "when a single order resolves issues arising on more than one lower court docket, separate notices of appeal must be filed.").

[7] On October 12, 2023, we granted Appellant's petition to consolidate Nos. 623, 1764 and 5058 for appeal.  ***See*** Order, 10/12/23.

Appellant first challenges the legality of his sentence for access device fraud.[8]  *Id.* at 29.  Citing **Commonwealth v. Eddowes**, 580 A.2d 769 (Pa. Super. 1990), Appellant argues

> the credit cards were used in the context of access device fraud. … Because the reasoning in **Eddowes** would suggest a credit card used illegally is *per se* a violation of access device fraud, the [sentences] should merge.  … [A]ny credit card used for access device fraud is, *per se*, [possession of] an instrument of crime….

*Id.* at 31.

Appellant compares the elements of access device fraud and PIC, and argues,

> to commit the act of access device fraud is to commit [PIC], *i.e.*, they are one and the same.  One cannot commit the crime of access device fraud without an access device being employed criminally.  **Commonwealth v. Anderson**, 650 A.2d 20, 24 (Pa. 1994).  Thus, the sentences should have merged….

*Id.* at 32.

The Commonwealth counters that Appellant's convictions are based upon two separate criminal acts:  (1) Appellant **possessed** a specially made or specially adapted credit card with the intent to employ it criminally (PIC); and (2) he knowingly **used** the altered or counterfeit access device (credit card) in attempting to obtain property or services (access device fraud).  **See**

---

[8] "A challenge to the legality of sentence … need not be preserved and is never waivable."  **Commonwealth v. Foster**, 17 A.3d 332, 334 n.1 (Pa. 2011).

Commonwealth's Brief at 21. Thus, the Commonwealth argues that Appellant was properly sentenced for two separate criminal acts. *See id.*

Whether convictions merge for sentencing is a question implicating the legality of the sentence. ***Commonwealth v. Baldwin***, 985 A.2d 830, 833 (Pa. 2009). Accordingly, we undertake a *de novo*, plenary review. ***Id.***

Our legislature addressed the merger of sentences at 42 Pa.C.S.A. § 9765:

> **No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act** and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765 (emphasis added). Accordingly,

> merger is appropriate only when two distinct criteria are satisfied: (1) **the crimes arise from a single criminal act**; and (2) all of the statutory elements of one of the offenses are included within the statutory elements of the other.

***Commonwealth v. Kimmel***, 125 A.3d 1272, 1276 (Pa. Super. 2015) (*en banc*) (emphasis added; citation omitted).

PIC is defined by the Crimes Code as follows:

> **(a)** *Criminal instruments generally.* — A person commits a misdemeanor of the first degree if he **possesses any instrument of crime with intent to employ it criminally.**

42 Pa.C.S.A. § 907(a) (some emphasis added). An instrument of crime is defined as

> **(1)** Anything specially made or specially adapted for criminal use.

**(2)** Anything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have.

18 Pa.C.S.A. § 907(d).

Under Crimes Code Section 4106(a)(1), a person commits access device fraud if he

**(1) uses an access device** to obtain or in an attempt to obtain property or services with knowledge that:

**(i)** the access device is counterfeit, altered or incomplete[.]

*Id.* § 4106(a)(1) (emphasis added).

Our review of the record discloses Appellant committed the crime of PIC by **possessing** a credit card "specially made and adapted for criminal use." *Id.* § 907(d)(1). Appellant committed the separate crime of access device fraud when he **used** the credit card (access device) to obtain or in an attempt to obtain property or services. *Id.* § 4106(a)(1). Because the crimes did not arise from a single criminal act, the trial court properly imposed separate sentences for Appellant's convictions of PIC and access device fraud. *See Kimmel*, 125 A.3d at 1276. Appellant's challenge to the legality of his sentences merits no relief. *See id.*

In his second claim, Appellant challenges the sufficiency of the evidence underlying his conviction of attempted murder. Appellant's Brief at 16. Appellant argues the Commonwealth failed to prove he acted with the requisite specific intent to kill. *Id.* Appellant compares this case to the

evidence deemed insufficient in **Commonwealth v. Predmore**, 199 A.3d 925 (Pa. Super. 2018) (*en banc*). Appellant's Brief at 18-19.

In **Predmore**, Appellant argues, two men confronted each other, but the altercation was broken up by the defendant's girlfriend. **Id.** at 18. However, the defendant then returned to his vehicle, retrieved a firearm, and shot the complainant twice. **Id.** According to Appellant, the **Predmore** Court held that while there was *prima facie* evidence the defendant took a substantial step towards a "killing," the evidence failed to establish he acted with the specific intent to kill. **Id.**

Appellant asserts that in this case, there was no prior altercation between Appellant and Neville. **Id.** at 19. Appellant asserts, "[w]hile at first blush this is a serious injury, the actual injury contradicts the severity." **Id.** In support, Appellant argues that Neville was able to drive, responsive, and did not suffer any injury to vital organs. **Id.** According to Appellant,

> while the injury looks worse than it actually was, it was treatable …, [Neville] was conscious during his treatment, and it was considered a simple procedure. If [Appellant had] intended to kill [] Neville, a close cut to the actual neck, chest, or veins would have been just as easy….

**Id.** at 20. Thus, Appellant argues, the Commonwealth failed to establish the specific intent to kill necessary to sustain his conviction of attempted murder. **Id.**

We review a challenge to the sufficiency of the evidence under the following standard:

- 10 -

The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Tucker*, 143 A.3d 955, 964 (Pa. Super. 2016) (citation

omitted).

The elements of attempted homicide are as follows:

Criminal attempt is separately codified at 18 Pa.C.S.A. § 901, which states, "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a).

Criminal attempt is a specific-intent crime. Thus, attempted murder requires a specific intent to kill. *Commonwealth v. Robertson*, 874 A.2d 1200, 1207 (Pa. Super. 2005) ("For the Commonwealth to prevail in a conviction of criminal attempt to commit homicide, it must prove beyond a reasonable doubt that the accused with a specific intent to kill took a substantial step towards that goal.").

*Commonwealth v. Palmer*, 192 A.3d 85, 88 (Pa. Super. 2018) (brackets

omitted). Thus, attempted murder is comprised of two primary elements:

- 11 -

> The *mens rea* element of the offense is specific intent to kill, which is identical to the *mens rea* element of murder in the first degree. The *actus reus* element of the offense is the commission of one or more acts which collectively constitute a substantial step toward the commission of a killing.

*Predmore*, 199 A.3d at 929.

We further recognize that,

> [w]here one does not verbalize the reasons for his actions, we are forced to look to the act itself to glean the intentions of the actor. Where the intention of the actor is obvious from the act itself, the finder of fact is justified in assigning the intention that is suggested by the conduct.

*Commonwealth v. Hall*, 830 A.2d 537, 542 (Pa. Super. 2003) (citation omitted). "[I]n instances where there is conflicting testimony, it is for the jury to determine the weight to be given the testimony. The credibility of a witness is a question for the fact-finder." *Id.* (citation omitted).

Instantly, at trial, Harrisburg Police Lieutenant Kyle Gautsch testified regarding the events of August 5, 2021. N.T., 2/1-2/23, at 32. Lieutenant Gautsch stated that, while working at the Harrisburg Hospital that night, he observed a man and woman enter the hospital's emergency room. *Id.* at 35. According to Lieutenant Gautsch, the woman's face and chest were covered in blood. *Id.* The man held a cloth, saturated in blood, to the side of his neck. *Id.* at 36. The couple informed him they had been involved in an altercation at Bill's Café, and had been "stabbed or sliced." *Id.* Lieutenant Gautsch stated,

> I was overly concerned, the female had a lot of blood. I mean, visibly, it was more shocking. But where the male was holding

- 12 -

the rag on his neck, his throat, I was really concerned about that. Because I saw the blood that was saturating or coming through the rag and knowing how … severe it can be if you get a laceration to your throat, so I was concerned about that.

*Id.* at 37.

Jimenez testified that on August 5, 2021, at around 8:00 p.m., she met Neville, the father of her children, at Bill's Café. *Id.* at 61, 62-63. While sitting at a table, Jimenez observed Appellant walk in and look towards Neville. *Id.* at 60-62. Jimenez indicated that she had known Appellant for about five years prior to the attack. *Id.* at 64-65. According to Jimenez, Appellant struck Neville, after which she observed Neville bleeding. *Id.* at 63. She stated, "I seen [*sic*] the blood already because it immediately … started pouring out." *Id.* at 68. Jimenez testified that she saw "something silver" in Appellant's hand, but "wasn't sure … exactly what it was." *Id.* at 68.

As described by the trial court in its opinion,

Appellant's car was running in the parking lot and as [Neville] and [] Jimenez chased him, [Appellant] got into the car and drove towards them, and they had to move out of the way to avoid being hit. ([N.T., 2/1-2/23,] at 73). [] Jimenez and [Neville] got into [Jimenez's] vehicle and the two followed Appellant; however, because of the amount of blood they were losing, the two decided to drive to a hospital. (*Id.* at 75). … [Jimenez] contacted [a police detective] and told him that Appellant … was the individual who cut her and [Neville]. (*Id.* at 81). [] Jimenez described [Neville's] scar from the incident and stated that it goes from the middle of his neck to his ear, and it is thick and bubbly in appearance. (*Id.* at 82).

Trial Court Opinion (Nos. 623 and 5058), 10/30/23, at 4-5.

The trial court further summarized the trial testimony of Cameron

Benedict, M.D. (Dr. Benedict), a surgical resident at Harrisburg Hospital:

> [Dr. Benedict] testified that she was working on August 5, 2021,
> when she was alerted to a trauma over the hospital PA system.
> (N.T., [2/1-2/23], pp. 131-136) (Commonwealth's Exh. No. 14).
> Dr. Benedict identified a laceration to the left side of [] Neville's
> neck[,] which was 10 to 11 centimeters in length and 2 to 3
> centimeters in depth. (*Id.* at 137-138). A CT scan was performed
> to ensure that there was no damage to underlying vessels in []
> Neville's neck, which there was not. (*Id.* at 139-141). **Because
> of the depth of the cut, [] Neville's wound was repaired in
> layers, requiring multiple stitches, including 18 to close the
> top layer of skin**. (*Id.* at 142-143). [] Neville was kept at the
> hospital overnight for observation. (*Id.* at 143-144). **Dr.
> Benedict testified that due to the clean edges of the cut Mr.
> Neville sustained, the object that created the cut must have
> been sharp.** (*Id.* at 145).
>
> Syed Jaffrey, [D.O. (Dr. Jaffrey),] a physician at UPMC
> Harrisburg, testified that he is chief resident of the emergency
> department Harrisburg Hospital, and was working on August 5,
> 2021 when he observed [] Neville. (*Id.* at 153-157). Because of
> the location of [] Neville's injury, Dr. Jaffrey initiated a trauma
> alert. (*Id.* at 156)….

Trial Court Opinion (Nos. 623 and 5058), 10/30/23, at 6-7 (emphasis added).

As the trial court explained in its opinion, the evidence was sufficient to

sustain Appellant's conviction of attempted murder as to Neville:

> Appellant asserts several arguments in support of his insufficiency
> argument. He argues there was only one "slash"[;] [] Neville had
> a thick neck which absorbed the brunt of the blow[;] Neville drove
> himself to the hospital[;] and the injury was contained by his own
> pressure. Appellant's arguments lack merit. These arguments
> are irrelevant to the inquiry of whether Appellant had intent.
> Under the circumstances, and as confirmed by the medical
> testimony, the slash to [] Neville's neck was considered a trauma
> upon his arrival in the emergency room[,] based on the location
> of the cut on his neck. The medical testimony further supported
> that had the cut gone deeper, it would have affected the blood

- 14 -

> vessels in [] Neville's neck. … [T]he evidence supports the conclusion that [] Appellant used a knife to inflict an injury to a vital part of Mr. Neville's body and, therefore, there was sufficient evidence to support his conviction for attempted murder.

*Id.* at 9. The record supports the trial court's findings and its legal conclusions are sound. *See id.*; *see also Commonwealth v. Arrington*, 86 A.3d 831, 840 (Pa. 2014) ("Specific intent … may be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body."). Appellant's challenge to the sufficiency of the evidence underlying his attempted murder conviction merits no relief.

In his third issue, Appellant challenges the sufficiency of the evidence to sustain his conviction of aggravated assault under 18 Pa.C.S.A. § 2702(a)(1).[9] Appellant's Brief at 20. Appellant asserts,

> it is unknown [under] which theory the jury ultimately convicted [Appellant], whether it was actually causing or attempting to cause serious bodily injury. … [Appellant] challenges his actions as lacking the requisite intent to cause serious bodily injury, and the injury does not meet the statutory definition….

*Id.* at 22.

---

[9] Section 2702(a)(1) provides a person is guilty of aggravated assault if he:

> attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to human life.

18 Pa.C.S.A. § 2702(a)(1).

Appellant argues that his actions towards Jimenez did not "reflect any form of conscious desire to leave her either dead or disfigured, nor a conscious disregard of a high risk of the same." *Id.* at 24. Appellant asserts that as he attempted to flee the café,

> he hit the wrong door while trying to leave. [Appellant] then swipe[d] down as [] Jimenez move[d] toward him. The evidence reflects an intent to escape and dissuade [] Jimenez from grappling him, not to leave her disfigured. Because he was fleeing, his conscious action was not to cause serious bodily injury, nor was it his specific action and goal to do so....

*Id.* at 24.

Appellant compares the facts in this case to those in ***Commonwealth v. Sinkiewicz***, 293 A.3d 681 (Pa. Super. 2023). In ***Sinkiewicz***, Appellant argues, this Court concluded the evidence was not sufficient to sustain his conviction of aggravated assault. Appellant's Brief at 26. In that case, Appellant claims there was no prior animosity between the police officer/assailant and victim, but the officer had swung a deadly weapon causing bodily injury. ***Id.***

A person commits aggravated assault if he, *inter alia*, "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S.A. § 2702(a)(1). We have explained the elements of aggravated assault as follows:

> "Serious bodily injury" has been defined as "[b]odily injury which creates a substantial risk of death **or which causes serious, permanent disfigurement**, or protracted loss or impairment of

the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. For aggravated assault purposes, an "attempt" is found where an "accused who possesses the required, specific intent acts in a manner which constitutes a substantial step toward perpetrating a serious bodily injury upon another." An intent ordinarily must be proven through circumstantial evidence and inferred from acts, conduct or attendant circumstances.

*Commonwealth v. Fortune*, 68 A.3d 980, 984 (Pa. Super. 2013) (some internal citations and quotation marks omitted; emphasis added).

At trial, Jimenez testified that after Appellant had cut Neville, she followed Appellant to the door, at which time Appellant cut her. N.T., 2/1-2/23, at 69. Jimenez stated,

> I just thought [Appellant] hit me. Because … I didn't feel it at the moment until … when I got outside, someone told me … he cut her. He cut her. And then I felt the blood … rushing down my face.

*Id.* Jimenez described the blood as "pouring down[.]" *Id.* Jimenez sustained a cut from the middle of her forehead to underneath her eye, requiring stitches. *Id.* at 76-77.

As the trial court summarized in its opinion, at trial, Dr. Benedict testified regarding Jimenez's injury:

> **Dr. Jaffrey repaired the laceration to Ms. Jimenez's face, which extended into her bone.** ([N.T., 2/1-2/23, at] 151). The repair of Ms. Jimenez's wound required three layers of stitches. (*Id.* at 163). **The length of the wound was approximately 8 centimeters, and the depth was estimated to be 3 millimeters.** (*Id.* at 163-164). Dr. Jaffrey testified that based on the nature of the wound, it was his opinion that a sharp, blunt object was used. (*Id.* at 164).

Trial Court Opinion (Nos. 623 and 5058), 10/30/23, at 7 (emphasis added).

In rejecting Appellant's sufficiency challenge, the trial court opined:

Here, the evidence presented established that Appellant wielded a blade of some type on the evening of August 5, 2021, that he used to slash [Jimenez's] face. Appellant's argument that the resultant scar is not enough to sustain the burden of permanent disfigurement under the statute is without merit. By wielding a blade at [] Jimenez while the chaos of that evening ensued, it can certainly be inferred that Appellant had the intent to cause serious bodily injury **and did in fact cause serious bodily injury**. Accordingly, there was sufficient evidence to support Appellant's conviction of aggravated assault.

*Id.* at 8 (emphasis added). We agree with and adopt the trial court's rationale.

We further conclude Appellant's reliance on *Sinkiewicz* is misplaced.

In *Sinkiewicz*, the appellee police officer (Appellee) acted with another officer

in attempting "to prevent 1,000 to 2,000 protestors from gaining entry to [the

municipal services building (MSB)]." *Sinkiewicz*, 293 A.3d at 690. As this

Court explained,

Appellee was among a group of police officers who began to use their police shields to push protestors back (away) from the steps of the [MSB], and pursuant to that course of action, … Appellee pushed his shield against a protestor who was standing next to Ms. Bachism[, the victim]. Ms. Bachism immediately began to use both of her hands to push back against the shield and in doing so, her hand made contact with … Appellee[']s arm. At that precise moment, … **Appellee struck Ms. Bachism once on her head and once on her arm with a baton.**

The sequence of actions between Ms. Bachism and … Appellee occurred in a time frame of a few seconds, and … Appellee did not attempt to strike Ms. Bachism again with the baton after his initial actions.

….

The sequence of actions between [the other victim,] Mr. Rupprecht and … Appellee occurred when … Appellee was among

a group of police officers who began to use their police shields to push protestors back (away) from the steps of the [MSB]. Mr. Rupprecht described this occurrence as very chaotic. Notably, Mr. Rupprecht does not state that … Appellee struck him more than once.

*Id.* at 689 (emphasis added).

In deeming the evidence insufficient to establish a *prima facie* case for aggravated assault, this Court opined:

The circumstances surrounding these assaults — which by all accounts were chaotic — does not establish Appellee possessed the requisite specific intent to cause serious bodily injury to either Bachism or Rupprecht when he struck each victim with his baton. Each strike was momentary **and not precipitated by any threats of harm or prior confrontations.**

*Id.* at 691 (emphasis added).

Here, by contrast, Appellant attacked Jimenez after attempting to murder Neville. Further, when Neville and Jimenez followed Appellant as he attempted to flee, he turned and struck Jimenez with a sharp object. Appellant's action cut Jimenez's forehead almost to the bone. The evidence established Jimenez sustained a serious, permanent disfigurement to her face, from her forehead to under her eye. This evidence, viewed in a light most favorable to the Commonwealth, was amply sufficient to sustain Appellant's conviction of aggravated assault. *Sinkiewicz*, 293 A.3d at 690 ("[W]hen a victim **actually sustains** serious bodily injury, the Commonwealth can, **but does not necessarily have to**, establish specific intent to cause such harm." *Id.* at 690 (emphasis added)). Appellant's final issue merits no relief.

Judgments of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/17/2024